No. 18-56360

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

———————————

ART TOBIAS,

*Plaintiff-Appellee,*

v.

MICHAEL ARTEAGA,
Detective No. 32722; et al.

*Defendants-Appellants.*

———————————

Appeal from the United States District Court
for the Central California
No. 2:17-cv-001076-DSF-AS

---

**PLAINTIFF-APPELLEE'S ANSWERING BRIEF**

---

Anand Swaminathan
David B. Owens
Megan Pierce
LOEVY & LOEVY
311 N. Aberdeen St, 3FL
Chicago, Illinois 60607
(312) 243-5900

TABLE OF AUTHORITIES ....................................................................... v

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................ 3

ISSUES PRESENTED ............................................................................... 4

STATEMENT OF THE CASE .................................................................... 5

I.   The Alvarado Terrace Shooting ...................................................... 5

II.  Detectives Decide to Frame Tobias And Conceal The Likely
     Perpetrator ..................................................................................... 6

     A. Initial Investigation Provides No Connection To Tobias ....... 6

     B. Detectives Decided to Frame Tobias Because His Mother
        Briefly Reported Him Missing ................................................. 7

     C. Detectives Coerce a False and Fabricated Confession in an
        Attempt to Bolster their Fabrications .................................... 10

        1. Interrogation of Tobias's Mother, Helen Contreras ......... 11

        2. The Forced Confession of Tobias ...................................... 11

           a. Physically and Psychologically Coercive
              Environment ................................................................. 12

           b. Lies, Psychological Pressure, and False
              Evidence Ploys ............................................................. 13

           c. Threats and Promises to a 13-Year Old Boy ................ 14

           d. Tobias's Invocation of His Right to Counsel ................ 18

           e. Detectives Feed Tobias the Facts Of the Crime ............ 19

     3. Tobias Tells His Mother He Falsely Confessed ...............21

    D. Detectives Refuse to Investigate the Man Found With the
       Murder Weapon And Suppress This
       Exculpatory Evidence ...........................................................21

    E. Tobias is Wrongfully Convicted and Incarcerated ...............23

SUMMARY OF THE ARGUMENT .........................................................26

ARGUMENT .......................................................................................27

  I.    Standards of Review .....................................................................27

  II.   This Court Lacks Jurisdiction.....................................................27

    A. This Court Has Limited Interlocutory
       Jurisdiction .......................................................................27

    B. This Appeal Is Premised On A Profound Disagreement
       With Tobias's Facts ...........................................................28

  III.  On Tobias's Facts, Detectives Coerced A False Confession In
    Violation of Clearly Established Law .........................................33

    A. Legal Standards...........................................................................33

      1. Vulnerabilities of Youth .......................................................40

      2. Threats and Promises...........................................................41

      3. Threats For Remaining Silent Are
        Categorically Prohibited.....................................................42

      4. Inadequate *Miranda* Warnings or Undermining Those
        Warnings ..............................................................................43

      5. Failing to Obtain A Meaningful *Miranda* Waiver ..............44

6. Continued Questioning After A Suspect Invokes the Right to Counsel ............................................. 45

7. Lies, False Evidence, and Other Pressure Designed to Obtain A Confession .............................................. 46

8. Feeding Facts that Constitute the Confession .................... 47

9. Unwanted Touching And Physical Intimidation................ 47

10. Interrogating To Get A Confession, Not Information ................................................. 47

B. Detectives Violated Tobias's Fifth Amendment Rights ............ 48

C. Prior to Tobias's Interrogation, It Was Clearly Established that Interrogators Could Not Deploy Detectives' Barrage of Tactics on a Vulnerable Juvenile............................................. 50

D. Detectives' Contrary Arguments Are Meritless ........................ 52

1. Whether The Invocation Was Equivocal Is Not A Dispositive Issue ................................................. 52

2. Clearly Established Law Provides That Explicitly Asking for An Attorney Constitutes An Unequivocal Invocation .......... 53

a. *This is The Obvious Case*.............................................. 53

b. *Controlling Authority Confirms Immunity is Unavailable* .............................................. 56

3. That One State-Court Trial Court Judge Erred Is Irrelevant ................................................. 59

4. The District Court Appropriately Addressed Immunity ...... 60

IV.    Detectives Are Not Entitled to Summary Judgment On Tobias's Substantive Due Process Claim ................................................. 62

V.    Defendants Cursory References To Tobias's Fabrication Claim Should Be Ignored ..................................................................... 66

CONCLUSION ......................................................................... 69

STATEMENT OF RELATED CASE ....................................... 70

STATEMENT OF COMPLAINCE.......................................... 71

STATEMENT OF SERVICE................................................... 72

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Adams v. Speers*, 473 F.3d 989 (9th Cir. 2007) ....................................... 32

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ................................... 33

*Alvarez v. Gomez*, 185 F.3d 995 (9th Cir. 1999) ............................... 56, 57

*Anderson v. Creighton*, 483 U.S. 635 (1987). .................................... 34, 35

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................ 33

*Arizona v. Fulminante*, 499 U.S. 270 (1991). .......................................... 47

*Ashcraft v. Tennessee*, 322 U.S. 143 (1944) ........................................... 38

*Ashcroft v. al–Kidd*, 563 U.S. 731 (2011) ................................................. 35

*Berghuis v. Thompkins*, 560 U.S. 370 (2010) ......................................... 44

*Blackburn v. Alabama*, 361 U.S. 199 (1960) ........................ 36, 37, 38, 39

*Boyd v. Benton Cty.*, 374 F.3d 773 (9th Cir. 2004) ................................ 56

*Bram v. United States*, 168 U.S. 532 (1897)................................ 36, 38, 41

*Brousseau v. Haugen*, 543 U.S. 194 (2004)....................................... 55, 59

*Brown v. Mississippi,* 297 U.S. 278 (1936) .............................................. 36

*Caldwell v. City and County of San Francisco,*
   889 F.3d 1105 (9th Cir. 2018) ............................................................ 67

*Capoeman v. Reed*, 754 F.2d 1512 (9th Cir. 1985).................................. 56

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................... 61

*Chambers v. Florida*, 309 U.S. 227 (1940) ............................................... 47

*Chavez v. Martinez*, 538 U.S. 760 (2003)................................................ 38

*Christian Legal Soc'y Chapter of Univ. of Cal. v.*
  Wu, 626 F.3d 483 (9th Cir. 2010) ...................................................... 66

*Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090 (9th Cir. 2005) ....... 33

*Cohen v. Beneficial Loan Corp.*, 337 U.S. 542 (1949) ............................ 27

*Collazo v. Estelle*, 940 F.2d 411 (9th Cir. 1991) ............................... 44, 45

*Connecticut v. Barrett*, 479 U.S. 523 (1998) ......................................... 54

*Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992)........................... passim

*Costanich v. Dep't of Soc. & Health Servs.*,
  627 F.3d 1101 (9th Cir. 2010) ........................................................... 68

*Crowe v. Cty of San Diego*, 608 F.3d 406 (9th Cir. 2010)............... passim

*Culombe v. Connecticut*, 367 U.S. 568 (1961)........................................ 37

*Davis v. United States,* 512 U.S. 452 (1994) .................................... 53, 55

*Devereaux* v. Abbey, 263 F.3d 1074 (9th Cir. 2001) ............................... 67

*Dickerson v. United States,* 530 U.S. 428 (2000).................................... 36

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) ...................... 58, 59

*Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) ................................... 40, 59

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ..................................... 40, 41

*Edwards v. Arizona*, 451 U.S. 477 (1981)............................................... 45

*Fare v. Michael C.*, 442 U.S. 707 (1979) ................................................ 45

*Fikes v. Alabama,* 352 U.S. 191(1957) ....................................... 43, 46, 47

*Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) ........................................ 40

*George v. Morris*, 736 F.3d 829 (9th Cir. 2013) ................................ 28, 32

*Graham v. Florida*, 560 U.S. 48 (2010) .................................................. 41

*Haynes v. Washington*, 373 U.S. 503 (1963) ........................................... 46

*Henry v. Kernan*, 197 F.3d 1021 (9th Cir. 1999) ....................... 43, 44, 59

*Hope v. Pelzer*, 536 U.S. 730 (2002) ................................................ 34, 35

*Hurd v. Terhune*, 619 F.3d 1080 (9th Cir. 2010) .................................. 54

*Illinois v. Perkins*, 496 U.S. 292 (1990) ................................................. 46

*In re Art T.,* 234 Cal. App. 4th 335 (2015) ................................. 36, 56, 60

*In re Gault,* 387 U.S. 1, 55 (1967) ..................................................... 40, 63

*In re Ozenne*, 841 F.3d 810 (9th Cir. 2016) ........................................... 27

*J.D.B. v. North Carolina*, 564 U.S. 261 (2011) ...................................... 41

*Johnson v. Jones*, 515 U.S. 304 (1995) ................................................... 50

*Knox v. Southwest Airlines*, 124 F.3d 1103 (9th Cir. 1997) .................... 27

*Luna v. Lamarque*, 400 F. App'x 169 (9th Cir. 2010) ............................ 58

*Malloy v. Hogan*, 378 U.S. 1 (1964) ...................................... 39, 41, 46, 62

*Maropulos v. County of Los Angeles*,
    560 F.3d 974 (9th Cir. 2009) ...................................................... 28, 61

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir.2011) .................................... 35

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ....................................... 66

*Michigan v. Moseley*, 423 U.S. 96 (1975) ................................................. 43

*Miller v. Fenton*, 474 U.S. 104 (1985) ............................................... 37, 59

*Mincey v. Arizona*, 437 U.S. 385 (1978) .................................................. 38

*Minnick v. Mississippi,* 498 U.S. 146 (1990) ........................................... 57

*Missouri v. Seibert*, 542 U.S. 600 (2004) ................................................ 43

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................ 28

*Moran v. Burbine*, 475 U.S. 412 (1986) .................................................. 44

*Murray v. Earle*, 405 F.3d 278 (5th Cir. 2005) ........................................ 45

*Ortiz v. Jordan*, 562 U.S. 180 (2011) ...................................................... 27

*Plascencia v. Estelle*, 990 F.2d 1259 (9th Cir. 1993) .............................. 46

*Reck v. Pate*, 367 U.S. 433 (1961) ............................................... 36, 37, 38

*Reyes v. City of Richmond*, 287 F.3d 346 (5th Cir. 2002) ...................... 32

*Robinson v. Borg*, 918 F.2d 1387 (9th Cir. 1990) ...................... 53, 54, 58

*Rochin v. California*, 342 U.S. 165 (1952) .............................................. 62

*Rodriguez v. Swartz,* 899 F.3d 719 (9th Cir. 2018) ................................ 55

*Roper v. Simmons*, 543 U.S. 551 (2005) ................................................. 41

*Sanders v. United States,* 373 U.S. 1 (1963) ........................................... 38

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ...................... 36, 37, 39

*Shedelbower v. Estelle*, 885 F.2d 570 (9th Cir. 1989)............................ 58

*Sierra Medical Services Alliance v. Kent*,
   883 F.3d 1216 (9th Cir. 2018) ........................................... 33

*Smith v. Endell*, 860 F.2d 1528 (9th Cir. 1988) ............................... 57, 58

*Smith v. Illinois*, 469 U.S. 91(1984)................................................ 45, 57

*Spano v. New York*, 360 U.S. 315 (1959) ................................... 42, 46, 47

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ...................................... 67

*Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2015) ............................... 28, 32

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009) ................ 26, 51, 65

*Tolan v. Cotton*, 572 U.S. 650 (2014) ................................................ 33, 34

*United States v. Aguilar*, 782 F.3d 1101 (9th Cir. 2015) ....................... 66

*United States v. Cheely*, 36 F.3d 1439 (9th Cir. 1994) .......................... 58

*United States v. De La Jara*, 973 F.2d 746 (9th Cir. 1992) ................... 57

*United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994) ....................... 42

*United States v. Lanier*, 520 U.S. 259 (1997) .......................................... 35

*United States v. McShane*, 462 F.2d 5 (9th Cir. 1972)........................... 42

*United States v. Miller,* 984 F.2d 1028 (9th Cir. 1993).......................... 47

*United States v. Perez-Lopez*, 348 F.3d 839 (9th Cir. 2003) .................. 43

*United States v. Rodriguez*, 518 F.3d 1072 (9th Cir. 2008) ................... 58

*United States v. Shi*, 525 F.3d 709 (9th Cir. 2008) ........................... 46, 47

*United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981) ........ 38, 42, 43, 49

*Ward ex rel. Crystal M. v. Ortega*,
    379 F. App'x 687 (9th Cir. 2010) .................................................... 44, 45

*Will v. United States*, 389 U.S. 90 (1967) ............................................... 27

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004)............................... 41

*Wilson v. Lawrence County,* 260 F.3d 946, 953 (8th Cir. 2001).............. 39

*Ziglar v. Abbasi,* 137 S. Ct. 1843 (2017) ........................................... 35, 55

## Statutes and Other Authorities

28 U.S.C. § 1331....................................................................................... 3

28 U.S.C. § 1291.................................................................................. 3, 27

42 U.S.C. § 1983..................................................................................... 28

Fed. R. Civ. P. 56 .................................................................................. 33

# INTRODUCTION

Thirteen-year old Art Tobias was wrongfully convicted of a homicide he did not commit. Tobias was convicted in violation of his constitutional rights, which the California Court of Appeal recognized in vacating the conviction. This suit followed.

The record illustrates that Appellant Detectives Arteaga, Cortina, and Pere ("Detectives") committed egregious misconduct to prosecute Tobias. Detectives used surveillance video to manufacture false "identifications" of Tobias from three police officers, two of whom had never met Tobias. These "identifications" were absurd, given that the video depicted a heavyset adult shooter, while Tobias was a diminutive child. Detectives nonetheless arrested and interrogated Tobias, and eventually obtained a false, forced confession. Even that was not enough. Detectives suppressed evidence concerning the arrest of a man that fit the crime and was proven to possess the murder weapon, but whom they refused to investigate.

This partial appeal concerns Tobias's coercion and substantive due process claims against Detectives related to the interrogation. There is neither jurisdiction over, nor merit to, the appeal. On Tobias's facts,

Detectives subjected a 13-year old boy to a guilt-presumptive interrogation for the purpose of extracting a confession from him though they knew he was innocent. To do so, they blew past Tobias's requests for his mother, for an attorney, and to remain silent; and they used an array of psychologically coercive tactics—confrontation and intimidation, threats and promises, lies and false evidence ploys, and the list goes on—to overcome his will and obtain a false confession.

These facts are not part of Detectives' statement of the case or argument. Instead, Detectives present a factual recitation that is sparse and selective, and resolves disputed facts in their favor. Accordingly, they have not presented a purely legal argument that falls within this Court's limited interlocutory jurisdiction, warranting dismissal.

But, even if this Court were to reach the merits, the appeal still fails. Clearly established law provides that officers who, in the totality of the circumstances, use coercive tactics to overbear the will of a suspect—particularly against juveniles—are not entitled to qualified immunity. With the facts properly construed and the legal questions properly framed, Detectives' appeal collapses. Decades of precedent

provides that Detectives' coercive methods can overcome a child's will, precluding qualified immunity.

Detectives instead ignore the totality of the circumstances, and improperly focus principally on one aspect therein—Tobias's request for counsel. But, Tobias's explicit request for counsel is one factor among many contributing to the totality of the circumstances that must be considered. The "invocation" issue is non-dispositive. Beyond that, Defendants' focus does them no help: it was clearly established in 2012 that explicitly asking to have an attorney constitutes an invocation of the right to counsel. This much is obvious, as confirmed by numerous controlling authorities. To reach the opposite conclusion would be to construe the facts *against* Tobias, and ignore decades of established law. Such an effort, and this entire appeal, should be rejected.

## JURISDICTIONAL STATEMENT

The Central District of California had jurisdiction. 28 U.S.C. § 1331. This Court lacks jurisdiction over this interlocutory appeal, because it does not arise from a final order, 28 U.S.C. § 1291, or an exception to the final-order requirement, as explained below. No timeliness issues preclude jurisdiction.

## ISSUES PRESENTED

1.     Whether this Court lacks interlocutory jurisdiction to consider Detectives' partial appeal of an order denying summary judgment where their arguments rest on disputed facts?

2.     Whether Detectives can obtain summary judgment on the basis of qualified immunity on Tobias's Fifth Amendment claim where they ignored the governing law and material facts in the record, and have construed the facts *against* Tobias?

3.     Whether Detectives are entitled to qualified immunity on Tobias's coerced-confession claim where they used an array of coercive tactics against a 13-year old despite the fact that it was clearly established long before 2012 that police officers may be liable for using those tactics to coerce a statement during a custodial interrogation?

4.     Whether Detectives are entitled to qualified immunity on Tobias's substantive due process claim where they unconscionably coerced a confession from a 13-year old while intentionally trampling on his constitutional rights?

5.     Whether this Court should consider Detectives' cursory and confusing reference to Tobias's fabrication of evidence claim, which

rests upon clearly established law, and is going to trial regardless of the outcome of this partial appeal?

## STATEMENT OF THE CASE

Detectives have construed facts in their own favor; ignored material facts that run contrary to their self-serving spin; included facts that are irrelevant and immaterial to their arguments; and relied upon scores of facts that are genuinely disputed. Tobias's facts, which must be credited, follow.

## I. The Alvarado Terrace Shooting

On August 18, 2012, shortly after midnight on a Friday-turned-Saturday morning, Alex Castaneda was shot and killed on the 1400 block of Alvarado Terrace in Los Angeles. 2ER 124, ¶61.[1] Castaneda was with several friends, two of whom were also non-fatally shot. *Id.* Surveillance footage capturing a shooter depicts a heavyset adult male firing at Castaneda and the others. *Id.* ¶¶67-68. Consistent with the video, witnesses described the shooter in the video as an adult, about 6-feet tall and weighing nearly 200 pounds. *Id.* ¶63. Because the

[1] Citations to paragraphs refer to Tobias's response to Detectives statement of facts, at pages 94-176 of Excerpt of Records ("ER"). Remaining citations correlate to the batesnumber in the ER or Plaintiff's Excerpt of Record ("PER").

perpetrators yelled "MS" before firing, they were believed to be members of the "Mara Salvatrucha" gang. *Id.* ¶64.

Tobias had nothing to do with the Castaneda homicide, and is completely innocent of this offense. *Id.* ¶60. At the time, Tobias was a skinny 13-year-old child who stood less than 5-feet tall, and weighed just over 100 pounds; he looked nothing like the substantially larger adult shooter depicted on surveillance video and observed by witnesses. *Id.* ¶¶61-68. Nor was Tobias a member of MS. *Id.* ¶66. Tobias was also at home with his mother when the shooting occurred, and therefore could not have committed the crime. *Id.* ¶70. Plaintiff had no criminal record and had never been arrested, much less convicted. *Id.* ¶140.

## II.  Detectives Decide to Frame Tobias And Conceal The Likely Perpetrator

### A. Initial Investigation Provides No Connection To Tobias

Four LAPD homicide detectives—Michael Arteaga, Jeff Cortina, John Motto, and Julian Pere—were assigned to the investigation. *Id.* ¶71. Motto and Pere reported to the scene soon after the shooting, where they collected evidence, spoke with other officers, and obtained the surveillance video footage. *Id.* None of the eyewitnesses, including

surviving victims, provided information implicating Tobias; no evidence at the scene linked him to the crime. *Id.*

### B. Detectives Decided to Frame Tobias Because His Mother Briefly Reported Him Missing

Detectives became aware of the Tobias after learning of missing-person's report filed by his mother, Helen Contreras. Friday evening, hours before the Castaneda shooting, Contreras went to the Rampart station because she could not find Tobias and wanted to make sure he was okay. *Id.* ¶74. After speaking with one officer, because she lived in MS territory (but despite the fact that she did not ask to see a gang officer), Contreras was referred to Officer Cooley, a "gang enforcement officer" specializing in MS. *Id.* ¶75.

Contreras briefly showed Cooley a photo of her son on her cell phone, and Cooley had never seen Tobias before. *Id.* ¶¶75-76. Cooley did not obtain a copy of this picture. *Id.* ¶77. After speaking with Contreras, Cooley checked LAPD computers to see what information the Department had regarding Tobias, which confirmed that he was a 13-years-old boy, just over 100 pounds and under 5-feet tall. *Id.* ¶¶83-85.

When the shooting occurred later that night, Cooley responded to the scene because MS was involved in the shooting. *Id.* ¶78. Cooley

learned about the surveillance video of the shooting, which he watched. *Id.* ¶¶81-82. Another gang officer specializing in MS, Defendant Dora Born also reported to the scene and viewed the video. *Id.* ¶79. Like Cooley, Born had never met Tobias. *Id.* Cooley and Born were both aware the evidence in LAPD resources and surveillance footage pointed away from Tobias. *Id.* ¶83.

When Detectives learned of the missing-person's report, they decided to pursue Tobias as a suspect and to use the missing-person's report as a pretext for doing so. *Id.* ¶¶101, 128. They knew that Tobias looked nothing like the shooter on the surveillance video and described by witnesses, *id.* ¶¶69, 101, 128, and that Contreras had called the station to inform the officers Tobias had returned home and was not missing. *See* 2PER 222-23.

Nonetheless, Detectives decided to manufacture false evidence purporting to implicate Tobias in the shooting. 2ER ¶¶69, 101-02. Initially, Detectives decided to use the video to attempt to manufacture "identifications" of Tobias from various people, none of whom were at the scene and some of whom had never even met Tobias. *Id.* ¶¶74-101.

Detectives thus refused to conduct photographic or in-person lineups with victims or witnesses. *Id.* ¶¶73, 180-81

For example, Detectives reached out to Cooley and Born. Cooley and Born *did not* identify Tobias from the surveillance video. *Id.* ¶¶97-99. Nor could they have—neither had ever met Tobias, the eyewitnesses described a 200-plus pound, 6-foot tall adult, and the surveillance video depicted a heavyset grown man; Tobias was obviously innocent. *Id.* ¶¶77, 82-86, 90-91. Despite this, Cooley and Born agreed to provide Detectives with false reports stating they "immediately" identified Tobias upon watching the footage. *Id.* ¶¶85, 88, 96.

Detectives Arteaga and Motto also went to Tobias's middle school, where they met with Defendant Daniel East, a Los Angeles Unified School District officer who conducted criminal investigations at the school in coordination with the LAPD. *Id.* ¶¶102-03, 115. Much of their initial conversation was audio recorded. As the recording indicates, Detectives showed the video of the shooting to East, who stated he could not make an identification based on the video and confirmed that the shooter was too large to be a middle school student. *Id.* ¶¶104-10.

Despite knowing East could not and did not identify Tobias, Detectives asked him to provide a statement to the contrary. *Id.* ¶¶116-26.

East agreed, and the three went on to discuss what the statement should say, and how Detectives would use this statement in their plan to frame Tobias: East would provide a false identification; Detectives, with East's help, would attempt to drum up additional fabricated identifications of Tobias to "prov[e] what [East] just saw"; the officers would "rope" Tobias's mother into the case; and they would make Tobias "frickin pay" if Contreras and others did not agree to say that they had identified Tobias as the shooter. *Id.* ¶¶111, 114, 126.

### C. Detectives Coerce a False and Fabricated Confession in an Attempt to Bolster their Fabrications

Following their meeting with East and after securing East's agreement to help, Detectives arrested Tobias at the school and brought him to the station. *Id.* ¶¶117, 128. They handcuffed him to a chair in an interrogation room, and left him isolated for over an hour while they focused on the next phase of their plan—"roping" Tobias's mother into their efforts to frame her son. *Id.* ¶¶127, 129.

### 1. Interrogation of Tobias's Mother, Helen Contreras

Despite Detectives' repeated efforts to pressure and trick Contreras into falsely identifying her son from a freeze-frame of the surveillance video, Contreras was adamant that the adult in the video was not her teenage child Tobias, immediately saying "that's not him," and explaining that he looked nothing like her son and that Tobias was home at the time of the shooting. *Id.* ¶¶136-37. Contreras repeatedly denied her son was involved, and deduced what was happening, saying "You're wrongfully accusing my son right now." *Id.* ¶137. Given their failure to secure a false identification from Contreras, Detectives decided to make Tobias "frickin pay." *Id.* ¶114.

### 2. The Forced Confession of Tobias

And they did. In a coordinated and planned interrogation of Tobias, Detectives used "guilt presumptive, psychologically manipulative, and confession driven techniques" on a small, 13-year-old boy. *Id.* ¶¶130-32, 139. Detectives made threats and promises, yelled at and intimidated Tobias, and fed him every fact that formed his eventual forced confession. *Id.* ¶160-163. In addition, they denied his pleas for an attorney and for his mother, *id.* ¶¶154-55, 159, 161, 166 179; they

insisted that Tobias was the shooter despite his persistent and earnest denials, *id.* ¶¶148, 153, 156; and they repeatedly lied to Tobias, saying that they already knew what happened, that his friends had implicated him in the shooting, and that his mother had identified him from the surveillance video, *id.* ¶¶143, 147, 157-58.

Categorized by tactic (rather than chronology) the interrogation included the following coercive elements and tactics:

### a. Physically and Psychologically Coercive Environment

Plaintiff was handcuffed to a chair in the corner of a small, windowless room, and all four Detectives entered the room displaying firearms. 4PER 448. Meanwhile, the leading police interrogation manual in the United States admonishes police interrogators not to place interrogated suspects in handcuffs and not to wear their guns in the interrogation room—the latter also expressly admonished against in LAPD's Homicide Manual. *Id.* With the other Detectives watching and able to intervene, Arteaga sat right beside and towered over Tobias, a 100-pound boy, sometimes inches from his face. He screamed, swore, put his hands on Tobias's shoulder, and got so close to Tobias that his firearm rubbed against the handcuffed child. 2ER ¶¶127, 163-164. The

environment was exactly the sort of "atmosphere of coercion or duress" that Detectives were supposed to avoid. 4PER 448.

### b. *Lies, Psychological Pressure, and False Evidence Ploys*

Against this inherently coercive backdrop, Detectives employed a number of tactics, including lies and false evidence ploys to create an immediate sense of hopelessness and make Tobias believe he had to say what they wanted him to say. *Id*. 438-39. They did so early on in the interrogation, before showing Tobias the surveillance video:

- "So probably there's a pretty fair amount of stuff that we already know." 10PER 1374.

- "In order for me to survive I went on and I what, I rolled on my friend. I dimed him out. I told on him. . . . I'm here to tell you that your day just went from bad to worse because someone that knows you did you the same way . . ." *Id*. 1389-90.

Detectives Pere, Cortina and Arteaga lied to Tobias many additional times, pretending to possess irrefutable evidence that made his guilt certain and inevitable:

- "I'm here to tell you, man, that's the video of you being captured on the 18th after midnight." *Id*. 1391.

- "Somebody gave you up" *Id*. 1392.

- "We do have proof. Here's the proof. The proof is we already asked somebody that gave you up. That's number one. Number two is we have the video to support what they said you did." *Id.* 1393.

- "I showed her [your mom] the video. She said that was you." *Id.* 1400.

- "Juries know that criminals [are] stupid...The bottom line is they're going to see the video. They're going to say yeah, it looks like him. They're going to bring your mom to take the stand, yeah, I identify that as my son." *Id.* 1406.

- "They fucking ratted you out big time, bro. They ratted you out big time." *Id.* 1418.

- "One of your homeys who is rolling on you because – he got busted for something else. We have your mom taking your picture saying that's my son." *Id.* 1422.

### c. *Threats and Promises to a 13-Year Old Boy*

Compounding the atmosphere of intimidation and hopelessness, Detectives also threatened Tobias with serious negative consequences if he continued to maintain his innocence. Detective Arteaga told Tobias that if he did not confess, he would look like a "cold blooded killer," a phrase he used more than 20 times during the interrogation. 2ER, ¶160. In contrast, Detectives assured Tobias that he would receive lenient treatment and help if he confessed. *Id.* ¶162.

Examples of Detectives' threats and promises during the

interrogation include:

- Threat: "You're full of shit. And when this case is presented to a district attorney's office they're going to see you're a cold-blooded killer . . . . They're going to see that you're a gangster who lies, who kills people, who has no compassion, who fucking doesn't give a shit." 10PER 1413.

- Promise: "I guarantee you we're going to get you some help. You're 13 years of age. You're not – You're not going to prison for life." *Id*. 1411.

- Both: "Do you think they're going to throw away the key on you? No. They're going to try to get you some help. You're going to go to [juvenile detention] and they're going to try to get you some help. But we can't help you if you're going to sit there and lie and – just be a cold-blooded killer." *Id*. 1408-09.

- Threat: "It's going to look like you're down – You're so far down for the hood that you didn't want to speak so they might throw the book at you." *Id*. 1419.

- Threat: "We have a lot more evidence than you think, and right now when we take the case to court they're going to think you're a big time gang killer who didn't want to tell the truth who is down for the hood." *Id*.

- Both: "You know, you're going to feel so much better when you tell the truth and that you're not worrying about what the fuck's going to happen, if the judge is going to throw the book at you or give you a light sentence." *Id*. 1426-27.

- Both: "I don't know what it takes to get into -- into your mind here but when we write this up we're going to write it how -- how it is. And right now it looks like you're a cold blooded MS gangster who doesn't give a fuck, who is down for the hood. That's what it's going to look like. . . . So when the judge looks at the case you think he's going to give a fuck about you?" *Id*. 1426.

In addition, Plaintiff was repeatedly given among the most coercive sorts of threats possible: that his family, and particularly his mother and sisters, would suffer if he did not confess. Examples include:

- "Well, you know what? I think it's fucking pitiful you're dragging your mom into this." *Id*. 1414.

- "You know, your mom was just telling me about your three sisters. You know, she's telling me about your dad, how he's schizophrenic, and she's telling me about your problems." *Id*. 1401.

- "Listen, bro, I understand. Listen to me. I have a kid your age. Okay? Think about your mom, okay? She looked at the video. She said yeah, that's my son. We have your mom. You're going to drag your mom into this?" *Id*. 1402.

- "Your mom is going to have to go to court for you not telling the truth. So you're going to drag your family into this? . . . That's fucked up." *Id*.

- "But listen, you need to man up. You -- you got your mom [into this]. You got Officer East in this. You got some of your homeys in this fucking mess. Okay? You're 13 years of age. You're a young kid. The court is going to take that into consideration. But you can't sit here and lie to Detectives. You can't do that. That's making you look like a cold blooded killer. Think about that. Okay? You need to tell us what happened." *Id.* 1405.

In light of Detectives' aggressive and relentless demands for a (false) confession, Tobias repeatedly requested to see his mother, asking Detective Arteaga at one point: "Could I just talk to my mom please?" 2ER ¶¶154, 166. Detectives denied his requests, in clear violation of LAPD policy stating that questioning of juveniles "shall cease" when a parent is requested; they also lied to Tobias about his mom. *Id.* ¶¶155, 161, 166, 179.

When Detectives would not allow Tobias to see his mother, he repeatedly tried to invoke his right to remain silent. *Id.* ¶167. He stated, "That's all. Got nothing else to say"; and "I'm not answering anything, dude, because everything I tell you guys is a lie to you guys." 10PER 1414-15. But each time that he did so, the questioning continued unabated. *Id.*

### d. Tobias's Invocation of His Right to Counsel

Detectives made every effort to prevent Tobias from invoking his right to counsel. They interrogated Tobias before giving him Miranda warnings, conveyed to Tobias that they would not answer his questions until he first answered theirs, and never sought an explicit *Miranda* waiver from Tobias—all of which conveyed to Tobias he had no meaningful choice but to answer their questions and respond to their accusations, and that, practically speaking, Tobias did not have a meaningful choice to invoke *Miranda* rights. 4PER 448. Very early in the interrogation, Detective Pere told Tobias, "We got to ask you some questions right here, and once we get the answers to our questions, then we'll be free to answer any of your questions, okay." *Id.* Detectives then questioned Tobias for almost twenty minutes before issuing *Miranda* warnings. *Id.* Right before issuing the warnings, Detectives Pere said to Cortina (in Tobias's presence), "You want to ask your questions first before I show him a picture?"; this clearly was intended to imply that the questions would continue regardless of the warnings that were about to be given. And then once the warnings were given, Detectives

Pere and Cortina did not obtain an explicit waiver from the 13-year old and instead immediately continued their questioning. 2ER ¶¶145-146.

Despite tactics clearly intended to prevent Tobias from invoking *Miranda*, Tobias nevertheless made an explicit request for an attorney. Plaintiff repeatedly denied his involvement in the crime and stated "that's not me," "that's not me, I don't know how else to tell you, that's not me." Detective Pere then stated: "We're here to speak to you to get your statement. Now if your statement is that that's not you, don't worry, we're going to write it down just the way you said." *Id.* ¶149. Plaintiff then actually interrupts Detective Pere and asks: "Could I have an attorney? Because that's not me." *Id.* ¶150. Rather than cease questioning, Detective Pere responded directly: "But — okay. **No**. Don't worry. You'll have an opportunity." Detective Cortina then immediately jumped in with a question to continue the interrogation. *Id.* ¶¶151. Put simply, Tobias asked for an attorney; Detectives told him no.

e. *Detectives Feed Tobias the Facts Of the Crime*

Finally, in order to bring credibility to their false, forced confession, Detectives fed Tobias the facts of the Castaneda murder throughout the interrogation, something they knew would lead to an

unreliable confession. *Id.* ¶169. In fact, Detectives showed Tobias the video of the shooting multiple times and walked through virtually all the facts of the crime, including the following: the shooting occurred on Friday night at 12:40 a.m., on Alvarado Terrace near "Pico" and "Hoover"; the shooting targeted people from the 18th Street and was carried out in retaliation for an earlier murder; there was a second shooter; a van drove by before the shooting and there was a getaway car to take the shooters away; there were two different types of guns used in the shooting; shots were fired into a group of people and one person died. *Id.*

When Tobias's will was finally overborne and he falsely confessed to the murder, he could not provide any details. He instead simply regurgitated the facts told to him by Detectives and responded "yes" to leading questions. *Id.* And when Detectives asked him open-ended questions requiring him to provide his own details of the crime, he could not do so. *Id.* ¶170. Contrary to Detectives false claim that only Arteaga was involved in the "second session," BR. 28 n.12, Pere later re-joined Arteaga and got Tobias to falsely agree he was the person in the video. 10PER 1439.

### 3. Tobias Tells His Mother He Falsely Confessed

After this false confession, Tobias was finally given the
opportunity to see his mother, in a conversation that was secretly taped
by the LAPD. The first thing he told his mother is that he did not do it,
and that "they forced me to" confess. 2ER ¶172. He also confirmed that
the Detectives' efforts to overbear his will had worked: he told his mom
that he confessed only because "they were going to tell the judge that
I'm a cold blooded killer and I'm going to get more time." *Id.*

Tobias was charged with the Castaneda homicide based upon four
pieces of fabricated evidence: the false statements from East, Cooley,
and Born and the forced, false confession. *Id.* ¶184.

### D. Detectives Refuse to Investigate the Man Found With the Murder Weapon And Suppress This Exculpatory Evidence

On August 21—three days after the crime—different LAPD
officers arrested Eric Martinez, a heavyset, 20-year-old Hispanic male
who matched the description of the shooter. *Id.* ¶¶190-91. At the time,
Martinez was (1) wearing clothes matching the shooter in the video, (2)
driving a vehicle that matched the getaway car, (3) purportedly yelling
"MS" from his car, and (4) in possession of the gun forensic testing later
confirmed was used in the shooting. *Id.* ¶¶191-93. All of this

information was provided to Detectives investigating the Castaneda homicide and became part of their file on the case. *Id.* ¶¶195, 197-200.

Detectives' problem was that one day before Martinez's arrest, they had coerced Tobias's false confession to the crime. Rather than disclose this exculpatory information (or pursue the likely perpetrator and concede their misconduct in interrogating Tobias), Detectives chose to hide the evidence and instead continue with their plan to frame Tobias for a crime they knew he did not commit. Among the documents intentionally suppressed were records relating to Martinez's prosecution for being in possession of Castaneda shooting murder weapon, an affidavit from an Olympic Division officer stating she believed Martinez was involved in the Castaneda homicide, and LAPD Firearms Unit results establishing the firearm in Martinez's possession was used in the shooting. *Id.* ¶¶204, 206, 208, 211-12. In fact, during Tobias's criminal trial, Cortina ran Martinez's criminal history in relation to the Castaneda shooting and created photo arrays with Martinez as the suspect; documents he suppressed. *Id.* ¶208. Arteaga, Cortina, and Pere all testified at trial while knowing that Tobias had been deprived of evidence that could have exonerated him. *Id.* ¶205.

## E. Tobias is Wrongfully Convicted and Incarcerated

Tobias was wrongfully convicted of a murder he did not commit and spent years incarcerated. *Id.* ¶¶60, 214. Tobias's conviction was overturned on direct appeal, where the court determined the conviction had been obtained in violation of the Fifth Amendment. 7PER 992-1016. On remand, the charges were dismissed. 2ER ¶214.

## F. The District Court Twice Rejects Detectives' Assertion of Qualified Immunity

Tobias claims that Detectives: (1) coerced his confession in violation of his Fifth Amendment rights; (2) used unconscionable interrogation tactics in violation of his Fourteenth Amendment rights; (3) fabricated evidence against him; (4) seized him in the absence of probable cause; (5) suppressed material evidence; (6) agreed to cooperate to frame him for a crime he did not commit, including by engaging in the conduct discussed above; and (7) failed to intervene to stop one another from violating his rights as described.

Detectives brought a motion to dismiss Tobias's coerced confession claim based on qualified immunity. The limited motion had a single, discrete argument: the law was not clearly established regarding Tobias's invocation of counsel such that Detectives were on notice that

their conduct violated Tobias's constitutional rights. Much attention was then paid to this issue—response and reply briefs were filed, a hearing was held, and Tobias provided the district court with a supplemental, extensive collection of case law showing that the law regarding Tobias's invocation of counsel was in fact clearly established at the time of the violation. 1PER 113-42.

The District Court denied Detectives' motion to dismiss on qualified immunity grounds after reviewing voluminous briefing. 1ER 25-31. And when Detectives sought an interlocutory appeal of this decision, Tobias again provided a comprehensive brief detailing the state of the invocation law at the time of Tobias's interrogation. 1PER 84-112. The district court refused to certify Detectives' appeal.

When Detectives raised the same issue yet again at summary judgment, the district court did not rehash the detailed analysis it had already provided, but instead gave an appropriate explanation for its second rejection of qualified immunity in the context of the disputed facts in this case.

The remainder of the district court's opinion denying summary judgment addressed Detectives' myriad arguments ignoring the factual

disputes in the case. The district court pointed out again and again that genuine disputes of material fact precluded summary judgment and that a reasonable jury could find for Tobias on each of his claims against Detectives. *See, e.g.*, 1ER 12-13 (a reasonable jury could find for Tobias on his coercive and unconscionable interrogation claims); *id.* at 18 (a dispute of material fact prevents summary judgment regarding the fabrication of evidence claim); *id.* at 18-19 (same with regard to the *Brady* claim); *id.* at 20 ( "the facts are hotly contested" regarding the claim of seizure without probable cause); *id.* at 21 (a reasonable jury could find for Tobias on the facts regarding his failure to intervene claim); *id.* (given the "disputed facts, summary judgment is not appropriate" on the conspiracy claim).

This interlocutory appeal followed, and is confined to the lawfulness of the interrogation. The appeal does not include Tobias's fabrication, *Brady*, conspiracy, and failure-to-intervene claims against Detectives and other defendants, all of which are going to trial.

## SUMMARY OF THE ARGUMENT

This interlocutory appeal should be dismissed. Detectives fail to make arguments this Court has jurisdiction to consider. They know the facts are hotly contested and have refused to accept Tobias's facts. Interlocutory review is not meant to resolve such disputes.

Even if the Court were to look to the merits, the appeal still fails. As it relates to Count I—a Fifth Amendment claim—Detectives' quest for qualified immunity is misplaced. For one, Detectives used blatantly coercive tactics. And, at "the time of the interrogation," police officers were "on notice under clearly established law that" if they "physically or psychologically coerced a statement from" a suspect doing violate the constitution. *Stoot v. City of Everett*, 582 F.3d 910, 927 (9th Cir. 2009).

Count II, a substantive due process claim, is governed by clearly established law, to which Detectives should have adhered. There is no legitimate governmental purpose in telling a 13-year old that he will be punished—viewed as a "cold-blooded killer"—if he refuses to confess. Detectives' conduct shocks the conscience, precluding immunity.

Finally, Detectives' references to fabrication of evidence are too cursory to warrant discussion and should be ignored.

## ARGUMENT

### I.    Standards of Review

This Court independently examines its jurisdiction, and Detectives bear the burden of establishing jurisdiction. *In re Ozenne*, 841 F.3d 810, 814 (9th Cir. 2016). Denial of summary judgment is reviewed *de novo*. *Knox v. Southwest Airlines*, 124 F.3d 1103, 1105 (9th Cir. 1997).

### II.    This Court Lacks Jurisdiction

The Court lacks interlocutory jurisdiction because this appeal is really a battle of the facts, not pure legal issues.

### A. This Court Has Limited Interlocutory Jurisdiction

Appellate jurisdiction is restricted almost exclusively to reviewing final decisions of lower courts. 28 U.S.C. § 1291; *Will v. United States*, 389 U.S. 90, 96 (1967) ("[A]ppellate review should be postponed, except in certain narrowly defined circumstances, until after final judgment has been rendered by the trial court.").

"Ordinarily, orders denying summary judgment do not qualify as 'final decisions' subject to appeal." *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011). The collateral order doctrine constitutes a limited exception.

Under this doctrine, a district court decision is immediately appealable if it (1) conclusively determines a disputed question; (2) resolves an issue separate from the merits; and (3) is effectively unreviewable on appeal. *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 546 (1949). In suits under 42 U.S.C. § 1983 this doctrine covers a narrow class of denials of qualified immunity that raise purely legal issues and, therefore, do not implicate "the correctness of the plaintiff's version of the facts." *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985).

## B. This Appeal Is Premised On A Profound Disagreement With Tobias's Facts

Evaluating jurisdiction at this stage involves consideration of the lower court's basis for denying summary judgment, *Maropulos v. County of Los Angeles*, 560 F.3d 974, 975 (9th Cir. 2009), and the position taken in the opening brief. Regarding the latter, the Court examines the *substance* of Detectives' arguments, beyond mere labels. *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013); *Stinson v. Gauger*, 868 F.3d 516, 525 (7th Cir. 2015) (*en banc*).

Detectives pay lip-service to the applicable standard, but a review of their brief makes clear that arguments are premised on fundamental

and extensive disagreements with Tobias's facts. Examples include but are not limited to:

- Detectives claim the interrogation was "largely unremarkable," Br. 8. But, Detectives ignored their extensive coercive tactics; that Tobias was sobbing throughout; that they made threats, promises, played on his love for his family, physically intimidated him, and violated his constitutional rights. *See* 2ER ¶¶127-79.

- Detectives contend that Tobias never exercised the right to remain silent. Br. 9. But Tobias invoked his right to silence several times, and each time Detectives continued questioning him. 2ER ¶167.

- Detectives assert Tobias was never physically intimidated, threatened, or subjected to any other improper tactics during his interrogation. Br. 11.[2] But Detectives repeatedly lied to Tobias, and Detective Arteaga yelled, swore, and stood within inches of Tobias's face while he was handcuffed, with his gun exposed. 2ER ¶¶143, 147, 157-58, 163.

---

[2] Detectives' claim Tobias's deposition supports them fails. The cited passage contradicts their facts, as do others. *See* 2ER 265-67 (explaining Detectives' were physically threatening); 2PER 156 (Q: "did they make any threats to you," A: "yes they did," and elaborating: "That if I didn't say the truth that they'd tell the judge and that I'd get a lot of fucking time, and they threw pieces -- bits and pieces about my dad, my mom. They made false things that made me feel like shit.").

- Detectives acknowledge a dispute about whether Tobias invoked his right to counsel, Br. 9, but they have not accepted Tobias's interpretation. Instead, they suggest he made a "passing comment" about an attorney, which Pere interpreted as "conditional." Br. 9. But, as the District Court found, Tobias did invoke his right to an attorney. 1ER 12. The invocation was unequivocal, and Detectives understood the statement as such. 2ER ¶¶150-52.

- Detectives claim that Contreras identified her son from the video to Arteaga, but later recanted. Br. 9-10 & n.8. But Contreras repeatedly denied that her son was the shooter in the freeze-frame Arteaga showed her. 2ER ¶¶136-37.

- Detectives contend that Tobias provided details about the Castaneda murder that were not otherwise known to them. Br. 10. But Tobias regurgitated facts provided to him by Detectives and was unable to fill in details when they asked him open-ended questions. *Id.* ¶¶169-70.

- Detectives claim they told Tobias "any potential criminal sentence would be up to the discretion of the judge," Br. 11. But actually they made threats that Tobias would be seen as a cold blooded killer and would "throw the book at him" if he did not confess. 2ER ¶¶160-62; 10PER 1419-21, 1426-27.

- Detectives claim Arteaga was "unaware of Tobias' purported request for counsel." Br. 10. But, Tobias did request counsel, and Arteaga watched it from a viewing room. 2ER ¶¶23, 40.

- Detectives assert that before mentioning *Miranda* warnings, they asked Tobias questions only to determine if he appreciated right from wrong. Br. 8. But, during the 20 minutes before even considering *Miranda*, Tobias was subject to interrogation questions intended to implicate

him as a gang member; told that he would have to answer their questions; told there was "stuff they already know"; and told he needed to understand "survival of the fittest." 2ER ¶143; 10PER 1368, 1373-74, 1387.[3]

- Detectives assert Cooley and Born both independently identified Tobias." Br. 6-7. But Tobias's claim, which is going to trial, is that these "identifications" were fabricated. 2ER ¶¶78-100.

- Detectives contend that East identified Tobias from the surveillance video during his meeting with them. Br. 7. But, East could not identify the shooter and recognized the person was too big to be a middle-school student. 2ER ¶¶105-11.

This non-exhaustive list of disputed facts demonstrates Detectives' appeal strays far from presenting purely legal issues over which this Court has jurisdiction. Detectives' appeal is about the interrogation, but in the pages of their brief describing the interrogation, Br. 8-11, nearly every material "fact" they mention is disputed. *See generally* 2ER ¶¶23-47. Detectives' refuse to make *any*— let alone all reasonable—inferences favorable to Tobias.

---

[3] Detectives claim, without citation, the early portion of the interrogation was not used in the prosecution. Br. 9 n.7. But, Pere testified about his early questioning at trial, and Cortina provided foundation for the entire transcript, which was admitted and reviewed on appeal. *In re Art T.*, 234 Cal. App. 4th 335, 339-40, 343-44 (2015).

Unsurprisingly, Detectives' factual attacks thoroughly infect their legal analysis. From top to bottom, their attempted legal arguments are premised—and dependent—on fundamental disputes with Tobias's facts. Br. at 21-23 (calling Tobias's invocation of counsel a "passing comment"); *id.* at 24-25 (mischaracterizing and ignoring governing law on the premise that Tobias had not sought counsel); *id.* at 28-31 (misconstruing and disputing the facts of the interrogation and Tobias's claims about them).

Thus, despite any lip service paid to the controlling standard, this Court lacks jurisdiction to consider this appeal. *See George*, 736 F.3d at 837 (where appellant does not make legal arguments that take the facts in the light most favorable to the appellee this Court will not do appellant's job, "either by manufacturing its legal arguments, or by combing through the record on its behalf" (citation omitted)); *Stinson*, 868 F.3d at 525 (if the Court "detect[s] a back-door effort to contest the facts, we will reject it and dismiss the appeal for want of jurisdiction." (citation omitted)); *Reyes v. City of Richmond*, 287 F.3d 346, 351-52 (5th Cir. 2002) (same). In short, the "exception to the normal rule prohibiting an appeal before a trial works only if the appellant concedes the facts

and seeks judgment on the law." *Adams v. Speers*, 473 F.3d 989, 991

(9th Cir. 2007). Detectives have not done so here.

### III.  On Tobias's Facts, Detectives Coerced A False Confession In Violation of Clearly Established Law

If this court looks past the jurisdictional problems, it must address

the merits based on Tobias's facts, with inferences drawn in his favor.

Viewing the record that way, the legal questions are easy. Count I

presents a straightforward claim alleging that the Detectives violated

Tobias's Fifth and Fourteenth Amendment right against self-

incrimination.[4] Properly framed, Tobias's facts uncontroversially

indicate Detectives' action violated his clearly established rights.

### A. Legal Standards

Summary judgment is appropriate only where "there is no

genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty

Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A genuine dispute of material

fact exists 'if the evidence is such that a reasonable jury could return a

---

[4] Supreme Court jurisprudence concerning the voluntariness of
confessions has historically involved overlapping discussions of the
Fifth Amendment and Fourteenth Amendment procedural due process.
Tobias refers to this as a Fifth Amendment claim throughout.

verdict for the nonmoving party.'" *Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

The Supreme Court has emphasized the "importance of drawing inferences in favor of the nonmovant," and reversed the grant of qualified immunity because the lower court had failed to make appropriate inferences. *Id.* Every reasonable factual inference must be drawn in favor of the party opposing the motion for summary judgment, from both direct and circumstantial evidence. *Id.* at 651; *Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090, 1095 (9th Cir. 2005).

To defeat a claim of immunity in an interlocutory appeal, Tobias must show: (1) his version of the facts establishes a constitutional violation; and (2) that the right violated was clearly established. *Tolan*, 572 U.S. at 655-56. Regarding whether a right was "clearly established," the core issue is notice; *i.e.,* the "'salient question . . . is whether the state of the law' at the time of an incident provided 'fair

warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730 (2002)). Analysis of whether a right was "clearly established" must occur in the context of a particular case, not in the abstract or at too high a level of generality. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

On the flipside, the Supreme Court has consistently rejected the notion that qualified immunity is confined to determining whether there is a case exactly on point; "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741 (citing *United States v. Lanier*, 520 U.S. 259 (1997)); *see Ziglar v. Abbasi,* 137 S. Ct. 1843, 1866-67 (2017) ("It is not necessary, of course, that 'the very action in question has previously been held unlawful.' That is, an officer might lose qualified immunity even if there is no reported case "directly on point."" (quoting, respectively, *Anderson*, 483 U.S. at 640, and *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). Otherwise, qualified immunity would become near-absolute immunity. *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir.2011) (*en banc*) ("If qualified immunity provided a shield in all novel

factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations" of the constitution).

For present purposes, Detectives do not contest that Tobias's Fifth Amendment rights were violated, Br. 17., instead claiming their potential liability was not clearly established. That argument fails.

For more than a century it has been clear criminal defendants may not be prosecuted with statements coerced by police. *Brown v. Mississippi,* 297 U.S. 278 (1936); *Bram v. United States*, 168 U.S. 532, 542 (1897). Nearly 60 years ago, the cases were already "too well known and too numerous to bear citation," as having "established the principle" that the Constitution "is grievously breached when an involuntary confession is obtained by state officers and introduced into evidence in a criminal prosecution which culminates in a conviction." *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960). The Constitution requires any confession be "made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. Washington*, 373 U.S. 503, 513 (1963) (internal quotes and citation omitted); *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973) (confession must be "the product of an essentially free and unconstrained choice by its maker").

The voluntariness of a confession is assessed by taking "into consideration the 'totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *Dickerson v. United States,* 530 U.S. 428, 434 (2000) (quoting *Schneckloth*, 412 U.S. at 226); *Reck v. Pate*, 367 U.S. 433, 440 (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account.").

The inquiry "must be broad" *Blackburn*, 361 U.S. at 206, and the determination of whether someone's will is overborne does not turn "on the presence or absence of a single controlling criterion" but must "reflect a careful scrutiny of all the surrounding circumstances." *Schneckloth*, 412 U.S. at 226. Factors considered include, but are not limited to, the suspect's age, education and intelligence; the length of the detention; and whether law enforcement advised the suspect of his constitutional rights, engaged in repetitive and prolonged questioning, or used physical punishment such as depriving the suspect of food or sleep. *Id.* Under established law, "[e]ach of these factors, in company with all of the surrounding circumstances—the duration and conditions of detention (if the confessor has been detained), the manifest attitude

of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control—is relevant." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

Involuntariness is therefore not limited to physical abuse or other "inherently coercive" tactics. *See Miller v. Fenton*, 474 U.S. 104, 110 (1985) (quoting *Ashcraft v. Tennessee*, 322 U.S. 143, 154 (1944)). The extreme and troubling view proffered by Detectives—that an interrogation is only unlawful if it is tantamount to torture—has long been rejected. *E.g.*, *Reck*, 367 U.S. at 440 ("But it is hardly necessary to state that the question whether a confession was extracted by coercion does not depend simply upon whether the police resorted to the crude tactic of deliberate physical abuse."); *Blackburn*, 361 U.S. at 206 ("Since . . . [1940], this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition."); *Cooper v. Dupnik*, 963 F.2d 1220, 1245 (9th Cir. 1992) (*en banc*) ("[T]orture is not necessary to render 'coercive' police conduct in the pursuit of a confession," "[p]sychological coercion can suffice."), *abrogated other grounds by Chavez v. Martinez*, 538 U.S. 760 (2003).

A "claim of involuntary confession predicated on alleged psychological coercion does not raise a different 'ground' than does one predicated on alleged physical coercion." *Sanders v. United States,* 373 U.S. 1, 16 (1963); *see also Cooper*, 963 F.2d at 1245 (citing *Mincey v. Arizona*, 437 U.S. 385 (1978)). Accordingly, "law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.'" *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (quoting *Blackburn*, 361 U.S. at 208); *see also Malloy v. Hogan*, 378 U.S. 1, 7 (1964) (quoting *Bram,* 168 U.S. at 542-43).

The foregoing was "clearly established" in 2012, and sufficient to illustrate that Detectives' are not entitled to qualified immunity, given the obvious cumulative effect of their efforts to overbear Tobias's will.[5]

---

[5] Detectives are wrong to claim "established precedent" only addresses "the appropriateness of certain interrogation tactics in isolation." Br. 31. Instead, it is clearly established that decisions do not turn "on the presence or absence of a single controlling criterion; each reflect[s] a careful scrutiny of all the surrounding circumstances" *Schneckloth*, 412 U.S. at 226; *see also Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001) ("[A] totality of the circumstances analysis does not permit

Additionally, by 2012, the following were clearly established as factors and tactics that can, under the totality of the circumstances, lead to an involuntary confession:

### 1. **Vulnerabilities of Youth**

It has "long been established that the constitutionality of interrogation techniques is judged by a higher standard when police interrogate a minor." *Crowe v. County of San Diego*, 608 F.3d 406, 431 (9th Cir. 2010) (citing *In re Gault,* 387 U.S. 1, 55 (1967)). For decades interrogators have been required to exercise "the greatest care" when interrogating juveniles and must "assure" any admission is "voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Gault*, 387 U.S. at 55; *cf. Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) ("[T]hat [Plaintiff] was a juvenile is of critical importance in determining the voluntariness of his confession.").

It would be a "callous disregard of … constitutional rights" to treat a juvenile suspect like "an adult in full possession of his senses and

state officials to cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will.").

knowledgeable of the consequences of his admissions." *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962). The Court has repeated these mandates: "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage," requiring officers to take it into account and exercise care when interrogating children. *Eddings v. Oklahoma*, 455 U.S. 104, 115(1982). Social science has further confirmed what the Court has long held. *See J.D.B. v. North Carolina*, 564 U.S. 261, 275 (2011) (explaining that "childhood yields objective conclusions" including that children are "most susceptible to influence,'" and "'outside pressures'") (quoting *Eddings*, 455 U.S. at 115, and *Roper v. Simmons*, 543 U.S. 551, 569 (2005))); *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.").

## 2. Threats and Promises

A "confession 'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Malloy*, 378 U.S. at 7 (quoting *Bram*, 168 U.S. at 542-43).

Promises of leniency are recognized as being likely to overbear the will. "[A] promise of leniency accompanied by threats or other coercive practices constitutes improper influence and makes a subsequent inculpatory statement involuntary." *Williams v. Woodford*, 384 F.3d 567, 595 (9th Cir. 2004). Established law further recognizes that threats and promises involving family members and other loved ones are among the most coercive. *E.g. Spano v. New York*, 360 U.S. 315, 323 (1959) (confession involuntary when officer told suspect a friend of his would get in trouble if he did not confess); *Tingle*, 658 F.2d at 1336 (threat that failure to cooperate would result in separation of mother and child was coercive in part because the "relationship between parent and child embodies a primordial and fundamental value of our society"); *United States v. McShane*, 462 F.2d 5, 7 (9th Cir. 1972) ("[W]e can readily imagine that the psychological coercion generated by concern for a loved one could impair a suspect's capacity for self-control, making his confession involuntary.").

### 3. Threats For Remaining Silent Are Categorically Prohibited

"There are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may

result in harsher treatment by a court or prosecutor." *United States v. Harrison*, 34 F.3d 886, 891-92 (9th Cir. 1994). Decades before the interrogation here this Court held:

> Although it is permissible for an interrogating officer to represent, under some circumstances, that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the Fifth Amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence.

*Tingle*, 658 F.2d at 1336 n.5.

### 4. Inadequate *Miranda* Warnings or Undermining Those Warnings

Police are required to meaningfully explain *Miranda* rights, particularly in light of the person they are interrogating, and they cannot take steps during the interrogation that undermine those rights. The warnings must "function effectively." *Missouri v. Seibert*, 542 U.S. 600, 611 (2004); *see Fikes v. Alabama,* 352 U.S. 191, 193 (1957) (adequacy of warning "must be viewed in the light of the facts concerning [his] mentality and experience"); *United States v. Perez-Lopez*, 348 F.3d 839, 847-49 (9th Cir. 2003) (misleading warnings found inadequate). Ineffective or non-existent *Miranda* warnings are deemed

coercive. *Michigan v. Moseley*, 423 U.S. 96, 104-06 (1975) (voluntariness "depends under *Miranda* on whether [the] 'right to cut off questioning' was 'scrupulously honored'"); *Henry v. Kernan*, 197 F.3d 1021, 1028 (9th Cir. 1999) (police's intentional violation of a suspect's *Miranda* rights by continued interrogation rendered any subsequent statements involuntary"); *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (*en banc*) (pressuring defendant to change mind about being silent and invocation of counsel "can only be seen as menacing").

### 5. Failing to Obtain A Meaningful *Miranda* Waiver

The Supreme Court has held "the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused "in fact knowingly and voluntarily waived [*Miranda*] rights" when making the statement. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quotes and citation omitted). Any waiver must be (1) "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Officers must

be assured the accused "understood these rights." *Berghuis*, 560 U.S. at 382-83. Otherwise, any subsequent statement cannot be presumed to be lawfully-obtained or voluntary. *Id.*; *see also Ward ex rel. Crystal M. v. Ortega*, 379 F. App'x 687, 690 (9th Cir. 2010) ("Although Crystal agreed to talk to the detective after hearing the standard recitation of *Miranda* rights, this fact alone does not show that she knowingly waived those rights." (citing *Murray v. Earle*, 405 F.3d 278, 289 (5th Cir. 2005) (finding that an 11-year old cold not have been found to have waived *Miranda* rights where, "[o]ther than having [her] sign a *Miranda* card, and briefly explaining her rights to her at the outset of the interrogation, the police took no precautions to ensure the voluntariness of her statement, let alone 'special care'")).

### 6. Continued Questioning After A Suspect Invokes the Right to Counsel

The "accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Fare v. Michael C.*, 442 U.S. 707, 719 (1979). Since 1981, federal courts have presumed a confession extracted during custodial interrogation after invocation of the right to counsel violates the Constitution. *Edwards v. Arizona*, 451 U.S. 477 (1981); *see Smith v. Illinois*, 469 U.S.

91, 95 (1984) (noting the "bright-line rule that all questioning must cease after an accused requests counsel"); *Collazo*, 940 F.2d at 416; *Cooper*, 963 F.2d at 1241.

### 7. Lies, False Evidence, and Other Pressure Designed to Obtain A Confession

Officers who lie, state they have fake evidence, or "otherwise use considerable psychological pressure designed to force a confession from the suspect" can be liable for coercing a confession. *Cooper*, 963 F.2d at 1247 (citing *Haynes v. Washington*, 373 U.S. 503, 514 (1963)); *see Malloy*, 378 U.S. at 8 (constitution "prohibits the States from inducing a person to confess through 'sympathy falsely aroused,' or other like inducement far short of 'compulsion by torture'" (quoting *Spano*, 360 U.S. at 323)); *Spano*, 360 U.S. at 323 (confession involuntary where suspect's "will was overborne by official pressure, fatigue and sympathy falsely aroused after considering all the facts"); *United States v. Shi*, 525 F.3d 709, 730 (9th Cir. 2008) (confession is involuntary when obtained via "psychological pressure"); *cf. Illinois v. Perkins*, 496 U.S. 292, 298 (1990) (absence intimidation contributed to voluntariness).

### 8. Feeding Facts that Constitute the Confession

Confession can be coerced where interrogators use abusive language and feed the facts that constitute the confession. *Plascencia v. Estelle*, 990 F.2d 1259 (9th Cir. 1993); *cf. Fikes,* 352 U.S. at 195 (leading nature of interrogation supported finding of involuntary confession); *Spano,* 360 U.S. at 322-24 (same).

### 9. Unwanted Touching And Physical Intimidation

Physical abuse against a suspect is always coercive. *United States v. Miller,* 984 F.2d 1028, 1030 (9th Cir. 1993). Moreover, a "confession is involuntary if coerced . . . by physical intimidation," *Shi*, 525 F.3d at 730, particularly where the intimidation creates a credible fear/threat of violence. *See Arizona v. Fulminante*, 499 U.S. 270, 287 (1991).

### 10. Interrogating To Get A Confession, Not Information

Interrogators "concerned primarily with securing a statement from defendant on which they could convict him," rather than obtaining information, will be subject "the most careful scrutiny." *Spano*, 360 U.S. at 324. This is especially the case where interrogators know the suspect is innocent or, as in *Cooper*, they come to believe so during the interrogation. 963 F.2d at 1231. Categorically rejecting a suspect's

statements—including their denials—because they are not sufficiently inculpatory is coercive, as such "relentless tenacity" can break suspects' wills and "render[] them helpless to resist their accusers further." *Chambers v. Florida*, 309 U.S. 227, 240 (1940).

## B. Detectives Violated Tobias's Fifth Amendment Rights

There is no question Tobias's will was overborne by the interrogation that took place here. 2ER ¶168. Indeed, <u>*all 10*</u> of the representative categories just discussed—and specifically established by controlling authorities—were evident in the interrogation of Tobias. Some elements are represented multiple times and in mutually reinforcing ways. Those include the fact that Detectives:

(1) ignored completely that Tobias was 13 and had no criminal history, and refused to use the "greatest care" to account for this vulnerability; they refused his requests for his mother, a request that confirmed his vulnerability, 2ER ¶¶140, 166-68;[6]

(2) made numerous threats, including that he would receive harsh penalties for not confessing and that if he did not confess his mother and sisters would be dragged into it; and also made promises (including "help") if he did confess, *id.* ¶161-62; 10PER 1402;

---

[6] Detectives refusal to exercise concern for Tobias relates directly to the fact the City of Los Angeles' custom and practice is to interrogate juveniles the same as adults and that the City has adopted no safeguards or training to ensure juveniles are not coerced. 1ER 22-23.

(3)     conducted inculpatory custodial questioning in the absence of any *Miranda* warnings, and undermined the *Miranda* warnings telling Tobias both before and after that they were going to get his statement; and bulldozed his right to silence, refusing to stop when Tobias told them he wanted to remain silent, 2ER ¶¶143-45, 149, 167;

(4)     did not ever obtain a knowing and voluntary *Miranda* waiver, *id.* ¶¶143-47.

(5)     told Tobias he would be punished for *not* confessing (and, instead, viewed by the judge and prosecutor as a cold blooded killer), which is categorically forbidden, *id.* ¶160;

(6)     refused to cease questioning Tobias when he specifically asked to have an attorney, and instead told Tobias "No.," *id.* ¶¶150-51;

(7)     repeatedly lied to and psychologically pressured Tobias, including telling him that his friends and his mother had identified him as the perpetrator, that his mother was sobbing in the next room; and repeatedly pressured to confess, yelling and swearing along the way, *id.* ¶¶147, 153, 155-58, 162-63;

(8)     fed Tobias details of the Castaneda homicide of which he was unaware, and ultimately every fact to which he confessed, *id.* ¶169;

(9)     physically intimidated Tobias by wearing guns, handcuffing him to a chair in the corner of a small room, physically contacting him, and getting in his face, *id.* ¶¶127, 163-64; and

(10)    used guilt presumptive interrogation techniques designed to elicit a confession rather than to get information, *id.* ¶139.

Bearing in mind the analysis turns on "the cumulative effect of the statements made in order to determine whether T[obias's] confession was voluntary," *Tingle*, 658 F.2d at 1336 n.4, Tobias's will was plainly overborne through a litany of tactics known to be coercive, especially to a juvenile.

### C. Prior to Tobias's Interrogation, It Was Clearly Established that Interrogators Could Not Deploy Detectives' Barrage of Tactics on a Vulnerable Juvenile

Detectives are not entitled to qualified immunity. They have not taken the facts in the light most favorable to Tobias, their arguments are not "separate from the merits" as they must be. *Johnson v. Jones*, 515 U.S. 304, 311 (1995). Moreover, in light of the law just discussed, there can be no doubt that Detectives were on notice in 2012 that aggressively interrogating a child through lies, pressure, physical intimidation, threats, promises, while the minor was sobbing, had asked for his mother, and was helpless, could result in an involuntary confession. Clearly established law provided Detectives were required to exercise great care in interrogating a 13-year old but they refused; preferring instead to relentlessly interrogate Tobias as an adult.

The insinuation Detectives did not know they were coercing a statement from Tobias defies credulity. Their goal, all along, was to pressure him to confess, something they stated explicitly. *E.g.*, 10PER 1405 ("But you can't sit here and lie to Detectives. You can't do that. That's making you look like a cold blooded killer. Think about that. Okay? *You need to tell us what happened.* (emphasis added)).

Well before 2012, this Court clearly held that officers engaged in similar conduct are not entitled to qualified immunity. *Crowe* held: "In 1998, when defendants interrogated Michael and Aaron, the clearly established rule in this Circuit was that a § 1983 cause of action for a violation of the Fifth Amendment's Self–Incrimination Clause arose as soon as police employed coercive means to compel a statement." 608 F.3d at 431 (citations omitted). There is no doubt that "coercive means" were used here.

*Crowe* pointed to *Stoot* and *Cooper*, which both reached the same conclusion. In *Stoot*, this Court held that, in 2003, an officer "was on notice under clearly established law that if he . . . physically or psychologically coerced a statement from [the juvenile plaintiff], the use

of the confessions could ripen into a Fifth Amendment violation." *Stoot* , 582 F.3d at 927.

In *Cooper*, some twenty years before the interrogation here, this Court ruled qualified immunity unavailable for an adult interrogation, concluding: "It is clearly established law that the Fifth and Fourteenth Amendments forbid the use of compulsion and coercion by law enforcement in pursuit of a confession." *Cooper*, 963 F.2d at 1251-52. This Court's message in *Cooper* is applicable here:

> [O]ne would have thought it unnecessary to spend so much time reiterating the settled law in an appellate opinion. Yet the facts of this case indicate that these law-enforcement officers resist that message. It is this stubborn resistance that has generated this lawsuit, not any lack of clarity as to the law.

*Id.* Detectives are not entitled to qualified immunity.

## D. Detectives' Contrary Arguments Are Meritless

Detectives spend the bulk of their brief raising issues that are legally incorrect or irrelevant. They should be rejected.

### 1. Whether The Invocation Was Equivocal Is Not A Dispositive Issue

Detectives brief presumes the coercion claim rises or falls on whether Tobias's invocation of his right to counsel was equivocal. It

does not. As explained above, the totality of the circumstances is what the jury will be required to consider on the coerced confession claim. Accordingly, while the presence of a *per se* violation of the Fifth Amendment (denying the right to counsel) would certainly be sufficient for *Plaintiff* to prevail, it is not at all necessary. Put differently, Tobias would be entitled to a trial on his coerced confession claim even if the whole exchange about an attorney had never happened; the totality of the circumstances overbore the will of an innocent 13-year old with no criminal history whom Detectives were bent on getting to confess to a crime they knew he did not commit.

## 2. Clearly Established Law Provides That Explicitly Asking for An Attorney Constitutes An Unequivocal Invocation

Detectives are simply wrong about the law concerning what constitutes an unequivocal invocation.

### a. This is The Obvious Case

*Davis v. United States*, the controlling case, holds: "if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." 512 U.S. 452, 458 (1994). Under *Davis*, a suspect need only "articulate his desire to have counsel

present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*. at 459. Detectives were on notice that a suspect "is required neither to use any magical formulation to invoke his rights nor to express his desire to obtain counsel with lawyer-like precision." *Robinson v. Borg*, 918 F.2d 1387, 1393 (9th Cir. 1990); *see Connecticut v. Barrett*, 479 U.S. 523, 529 (1998) (the words must be "understood as ordinary people would understand them"). Further, a suspect can invoke their rights "through an explanatory refusal," which must also be considered. *Hurd v. Terhune*, 619 F.3d 1080, 1089 (9th Cir. 2010).

No reasonable officer could think *Davis* was unsatisfied in the context here. In the middle of Pere's continued demands for an admission after Tobias's numerous denials, Tobias interrupts and says, "Could I have an attorney? Because that is not me." The plain request can only be reasonably interpreted one way: as a request to have an attorney, with an explanatory refusal: *because that's not me!* Moreover, we know that Detective Pere *did* interpret this request as exactly that, because he answered the question (albeit in direct contravention of the law): "No. Don't Worry. You'll have the opportunity later."

Tobias did not mention an attorney in the abstract or, as Detectives like to put it, "in passing" (a characterization that disputes Tobias's facts). Tobias was not bringing up the "idea" of an attorney—he asked to have one specifically. The straightforward application of *Davis* lends itself to only one conclusion on the facts of this case, given that: (1) Tobias made an explicit request for counsel ("Could I have an attorney?); the (2) request interrupted the officer's comment demanding a statement; (3) the invocation included an explanatory refusal ("Because that's not me"); and (4) the objective evidence indicates the interrogators actually understood the request because they answered the question ("No. Don't Worry. You'll have the opportunity").

In other words, this truly is the "obvious case"—where "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," *Davis*, 512 U.S. at 459, making qualified immunity unavailable. *cf. Rodriguez v. Swartz,* 899 F.3d 719, 734 (9th Cir. 2018) (qualified immunity unavailable in the "obvious case" (citing *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) (*per curiam*)); *see also Ziglar,* 137 S. Ct. at 1866 (qualified immunity

unavailable where application of pre-existing law is "apparent" even where there is no case "directly on point"). Accordingly, as the District Court recognized, Tobias's invocation was clear, unconditional, and stronger than others deemed sufficient; that the precise formulation of Tobias's explicit request has not arisen in another case is immaterial.

### b. *Controlling Authority Confirms Immunity is Unavailable*

Even assuming this were not an obvious case, pre-existing law made clear that refusing an explicit request for an attorney and saying "no, we'll get to that later" was unconstitutional. Controlling authority constitutes decisions of this Court and the Supreme Court, unless that authority does not exist. *Boyd v. Benton Cty.*, 374 F.3d 773, 781 (9th Cir. 2004) ("[W]e begin our inquiry by looking to binding precedent. If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end." (citing *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir. 1985)).

Here, though acknowledging it is not "controlling authority," Br. 18, Detectives point to the California Court of Appeal decision overturning Tobias's conviction as an indication that the law was not

settled. *Id.* at 12, 25. Detectives' reference to this decision is puzzling. That Court held:

> Even if this request had been made by an adult, we believe it would have been an unequivocal request for counsel.

*In re Art T.,* 234 Cal. App. 4th 335, 355 n.4 (2015).

The appellate court cited two decisions that *do* constitute controlling authority: (1) *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999), which held that "'Can I get an attorney right now, man?'" was an unequivocal invocation."; and (2) *United States v. De La Jara*, 973 F.2d 746, 750 (9th Cir. 1992), which held "Can I call my attorney?" was an invocation of right to counsel. *Alvarez* and *De La Jara* confirm that, under clearly established law, Tobias's request was unequivocal.

Additional controlling authorities confirm that *asking to have* an attorney should indicate to a reasonable officer the person is invoking their right to counsel. The Supreme Court in *Smith v. Illinois*, 469 U.S. 91, 93 (1984), found that a statement—though *less* clear than Tobias's— was unequivocal, where the following occurred: "Q. You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that? A. Uh, yeah. I'd like to do that." Likewise, *Minnick v. Mississippi* found a statement—also

*less* clear than Tobias's—"Come back Monday when I have a lawyer"—was an invocation. 498 U.S. 146, 148 (1990).

Another controlling authority is *Smith v. Endell*, 860 F.2d 1528, 1529, 1531 (9th Cir. 1988) ("Endell"), where this Court held a question—still *less* clear than Tobias's—"Can I talk to a lawyer?" was not ambiguous or equivocal. As the District Court found, Tobias's invocation was "stronger than Smith's," because his request "was not conditional" and Tobias "stated a specific reason he wanted a lawyer." 1ER29 n.5 (citing *Endell*, 860 F.2d at 1531). Further, Tobias asked to *have* an attorney—not just talk to one.

This Court has repeatedly found that statements far less explicit than Tobias's invoked the right to counsel. For example, *Shedelbower v. Estelle*, 885 F.2d 570, 571-73 (9th Cir. 1989), held that "You know, I'm scared now. I think I should call an attorney" was a clear invocation, and *Robinson v. Borg*, 918 F.2d 1387, 1389 (9th Cir. 1990), held that "I have to get me a good lawyer, man. Can I make a phone call?" was a clear invocation of the right to counsel. *See also Luna v. Lamarque*, 400 F. App'x 169, 172 (9th Cir. 2010) ("We hold that in the circumstances of this interrogation, Luna's final statement—"[I]t sounds like I need a

lawyer. And I need help"—was an invocation of his right to counsel. (citing *United States v. Rodriguez*, 518 F.3d 1072, 1078 (9th Cir. 2008); and *United States v. Cheely*, 36 F.3d 1439, 1447–48 (9th Cir. 1994)).

In short, while this is an "obvious case," the foregoing presents a "'a body of relevant case law'" clearly establishing that a reasonable officer should have viewed Tobias's explicit request to have an attorney as an invocation of his right to counsel. *District of Columbia v. Wesby*, 138 S. Ct. 577, 581 (2018) (quoting *Brosseau*, 543 U.S. at 199). Qualified immunity is unavailable here.

### 3. That One State-Court Trial Court Judge Erred Is Irrelevant

Detectives point to the fact that the juvenile court trial judge erred in not suppressing Tobias's statement. But as Detectives concede, this is not a "controlling authority." Moreover, "the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 110 (1985). Nor are state-court trial impervious to error, even to the point that this Court has found their judgments to be so erroneous they unreasonably apply federal law. *E.g. Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) (granting *habeas* on invocation issue under AEDPA); *Henry*, 197 F.3d at 1027

("Although both the California Court of Appeal and the district court found that the interrogation was conducted calmly in a relaxed setting, this determination is belied by the actual record of the interrogation.").

Indeed, the juvenile court—who did not view the video of the interrogation—was overturned on direct appeal based upon this Court's decisions in *Alvarez* and *De La Jara. In re Art T.*, 234 Cal. App. 4th at 355 n.4. The trial court's error is irrelevant and immaterial.

### 4. The District Court Appropriately Addressed Immunity

Detectives argue the District Court did not adequately discuss the qualified immunity defense. The claim rings hollow.

First, Detectives have still not contended with the clearly established law discussed above and presented to the Court below.

Second, the District Court found Plaintiff "had his request for counsel ignored." 1ER12. Inherent in that sentence, which Detectives' recognize they cannot challenge, *see* Br. 16 (acknowledging the court "must also take as given the facts the district court assumed when it denied summary judgment"), is a finding that, on the summary judgment record, Tobias invoked his right to counsel. Assuming that

fact, there is no basis for qualified immunity since it was clearly established that a request for an attorney should cease the questioning.

Third, Detectives' assertion that the Court did not appreciate the qualified immunity issues is belied by the record. The District Court's summary judgment decision describes the rights at issue, applies the applicable standard, makes findings about the interrogation (which Detectives actually contest), and then denied qualified immunity on the basis that the "rights *in the context of this case* are so well established that law enforcement officers must be deemed to have knowledge of them." 1ER. 23 (emphasis added). The District Court did not, as Detectives claim, operate at too high a level of generality immediately after citing *Wesby*. Nor did the court below, "issued a summary order without explanation." *Maropulos*, 560 F.3d at 975. Instead, the district court reviewed the record, made findings, and concluded "genuine disputes of material fact remain with respect to the constitutional claims" against Detectives.[7]

_____

[7] Detectives assert the trial court misconstrued the burden at summary judgment. Br. 20. But, it their initial burden to show that *no* disputes of material fact exist that preclude summary judgment, and they failed to do so. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Fourth, the District Court had already extensively considered Detectives "invocation" argument at the motion to dismiss stage. After extensive briefing, including submission of myriad controlling cases, s*ee* 1ER 84-142, the trial court recognized clearly established law indicated Tobias invoked his right to counsel. There was no need to re-hash this at summary judgment, particularly given the totality of the circumstances governs and the invocation issue is not dispositive to the immunity defense.

## IV.   Detectives Are Not Entitled to Summary Judgment On Tobias's Substantive Due Process Claim

Cleary established law provides that Count II operates under the shocks-the-conscience standard, instead of the totality of the circumstances above. *Malloy,* 378 U.S. at 7; *Rochin v. California*, 342 U.S. 165, 174 (1952). Evidence obtained by methods "so brutal and so offensive to human dignity" that they "shock[] the conscience" violate the Due Process Clause of the Fourteenth Amendment. *Rochin*, 342 U.S. at 174; *see, e.g.*, *Crowe*, 608 F.3d at 431-32 (reversing grant of summary judgment on "shocks the conscience" due process claims related to interrogation of two juveniles). Conduct need not constitute "torture" to be conscience-shocking. *Cooper*, 963 F.2d at 1249-50.

*Cooper* and *Crowe* control here. *Cooper* held that police violated an adult suspect's substantive due process rights when they "ignored Cooper's repeated requests to speak with an attorney, deliberately infringed on his Constitutional right to remain silent, and relentlessly interrogated him in an attempt to extract a confession." *Crowe*, 608 F.3d at 867 (citing *Cooper*, 963 F.2d at 1223). The same is true here. Detectives ignored Tobias's request for counsel and his mother, overrode his right to silence, and subjected him to a relentless and aggressive interrogation. Like *Cooper*, Tobias "was reduced to a state of agitation and anxiety marked by tears and sobbing as he persistently maintained his innocence in the face of [the officer's] onslaught." 963 F.2d at 1231. The facts here are even more egregious given Tobias was just 13 at the time.

Likewise, in *Crowe* this Court denied qualified immunity where a 14- and 15-year old were isolated and subjected an interrogation "during which they were cajoled, threatened, lied to, and relentlessly pressured by teams of police officers." 608 F.3d at 432. That is precisely what happened here—Tobias was "cajoled, threatened, and lied to" by unrelenting officers. Qualified immunity was unavailable in *Crowe* due

to these tactics and in light of the fact that (1) *Cooper* had made clearly established law, and (2) the Supreme Court's precedent requiring "the interrogation of a minor be conducted with "'the greatest care.'" *Id.* (quoting *Gault*, 387 U.S. at 55). These factors were all the more true years later when Detectives interrogated Tobias in 2012.

Though the foregoing is sufficient, four additional points of emphasis bear mention:

First, Tobias was only 13, had no criminal history, and had never even been arrested (which Detectives knew), 2ER ¶140, making the refusal to treat him as an adult, instead of with "great care," inexcusable and unconscionable.

Second, on Plaintiff's facts, the Detectives knew Tobias was innocent—he did not come close to fitting the eyewitness descriptions or surveillance video—but they nevertheless fabricated Cooley, Born and East's so-called identifications. In conscience-shocking behavior, they then interrogated Tobias with the specific purpose of overbearing the will of a 13-year old child to extract a confession they knew was false.

Third, Detectives had a plan: they were going to try to "rope" Tobias's mother into the investigation or somebody—her 13 year old

son—was going to have to pay. This is analogous to the plan in *Cooper* to intentionally violate a suspect's constitutional rights. And, such a plan was evident here, given that: Detectives waited more than 20 minutes before providing (cursory) *Miranda* warnings; they repeatedly told Tobias he had to give a statement; they refused his request for an attorney; they told Tobias he would be punished harshly if he exercised his right to silence and refused to confess; and the Detectives coordinated their efforts as the interrogation proceeded, given that the others were able to watch events unfold. This is precisely the sort of extreme and blatant conduct—that which tramples on constitutional rights—that shocks the conscience.

Fourth, Detectives point out that *Stoot* did not find a due process violation. But, *Stoot*—which was decided at the pleading stage— actually confirms this case is controlled by *Cooper* and *Crowe.* Unlike *Cooper*, *Stoot* did not involve (1) conduct that was not supported by governmental interest, or (2) a "calculated plan" to violate the suspect's constitutional rights. 582 F.3d at 929. Both of these criterion are met here—there is no governmental interest, for example, in telling Tobias he would be punished as a "cold blooded killer" and "drag" his mother

into it if he remained silent; and Detectives acted pursuant to a plan to make Tobias "pay" after their attempts to "rope his mother" into it failed.

Finally like *Crowe* but unlike *Stoot*, Tobias's claim is supported by expert testimony explaining this interrogation was psychologically coercive and departed from police practices, a fact relevant to Detectives' state of mind when assessing their facile claim they lacked notice their actions were unconscionable. *Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018). Qualified immunity is unavailable.

## V. Defendants' Cursory References To Tobias's Fabrication Claim Should Be Ignored

In the midst of what appears to be a discussion of Tobias's substantive due process claim, Detectives confusingly discuss cases pertaining to the fabrication of evidence. Br. 27-30. To the extent Detectives attempt to include the fabrication claim as part of this appeal, their efforts fail.

First, even assuming Detectives' cursory references constitute an attempt to challenge the confession-related aspects of this claim, that undeveloped argument has been forfeited. *See Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010)

(refusing to consider an issue raised summarily and without supporting argument); *United States v. Aguilar*, 782 F.3d 1101, 1108 (9th Cir. 2015) (court will not manufacture argument for party).

Second, Detectives' comments about fabrication suffer from the same jurisdictional defects as other arguments—their premise is a dispute with Plaintiff's facts, not a legal question—that falls beyond the scope of an interlocutory appeal.

Third, "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government"; this proposition is "virtually self-evident." *Devereaux* v. *Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc).

Fourth, even if the Court reaches the issue, there is substantial evidence that would allow a reasonable factfinder to conclude that Detectives fabricated Tobias's confession. A plaintiff can prove a fabrication claim with direct evidence, or via circumstantial/indirect evidence. *Caldwell v. City and County of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018). Circumstantially, a plaintiff can point to evidence illustrating "(1) [d]efendants continued their investigation . . . despite

the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Devereaux*, 263 F.3d at 1076.

Detectives do not address that they knew Tobias was innocent, yet continued their efforts to frame him. 2ER ¶¶69, 101, 140, 183, 190-92, 204, 206-12; 2PER 222-23. This alone is sufficient to allow a reasonable jury to find for Tobias. But Tobias can also prevail based on Detectives' coercive and abusive interrogation tactics. As discussed above, the Detectives' argument otherwise is based on a fundamental disagreement with Tobias's facts.

Alternatively, "deliberate fabrication can be shown by direct evidence." *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017) (quoting *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010)). Detectives ignore that there is direct evidence that they fabricated Tobias's confession by feeding him the facts regarding the shooting, and then asking him to confirm those facts. 2ER ¶169.

In short, while the references to fabrication should be ignored, they fail substantively as well.

## CONCLUSION

For the reasons above, Detectives' appeal should be dismissed or, alternatively, their request for qualified immunity should be rejected. Regardless, this partial appeal should be remanded for trial on all of Tobias's claims.

Dated: May 13, 2019

Respectfully submitted,

**ART TOBIAS**

By: /s/ David B. Owens

David B. Owens
Cal. Bar No. 275030
david@loevy.com
LOEVY & LOEVY
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
(312) 243-5902 (Fax)

# STATEMENT OF RELATED CASE

**9th Cir. Case Numbers**: <u>18-56360 and 18-56245</u>

The undersigned attorney states:

[X] I am aware of one related case currently pending in this Court, the number and name of each case and its relationship to this case are: *Tobias v. East*, No. 18-56245, and this matter, *Tobias v. Arteaga*, 18-56360, arise from the same proceedings below, No. 2:17-cv-1076-DSF-AS (C.D. Cal). The *East* case is also an interlocutory appeal arising from the denial of summary judgment below, though East did not interrogate Tobias.

<u>/s/ David B. Owens</u>                            **Dated:** <u>May 13, 2019</u>

## CERTIFICATE OF COMPLIANCE

I, David B. Owens, certify pursuant to Fed. R. A. P. 32(a)(4) and

Pursuant to C.R. 32-1, that this PLAINTIFF-APPELLEE'S

ANSWERING BRIEF contains, 13,812 words, excluding items

exempted from by Fed. R. App. P. 32(f). The brief's type size and type

face comply with Fed. R. App. P. 32(a)(5) and (6).


/s/ David B. Owens               **Dated**:   May 13, 2019

## CERTIFICATE OF SERVICE

I, David B. Owens, an attorney certify that, on May 13, 2019, I caused the foregoing to be filed via the Court's electronic filing system, which effected service on all counsel of record.

/s/ David B. Owens          **Dated**:  May 13, 2019