No. 18-56360

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

ART TOBIAS,

*Plaintiff-Appellee,*

*v.*

MICHAEL ARTEAGA,
Detective No. 32722; et al.,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court
for the Central District of California
No. 2:17-cv-001076-DSF-AS, Hon. Dale S. Fischer

---

PLAINTIFF-APPELEE ART TOBIAS'S
PETITION FOR REHEARING *EN BANC*

---

Anand Swaminathan
David B. Owens
Megan Pierce
LOEVY & LOEVY
311 N. Aberdeen St, Third Fl
Chicago, Illinois 60607
(312) 243-5900

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iii

RULE 35(b) STATEMENT ..................................................................1

INTRODUCTION ..................................................................................2

BACKGROUND ....................................................................................3

    A. Detectives Interrogate and Wrongfully Convict a Child.................3

        1. *Threats and Promises*...............................................................4

        2. *Invocation of Constitutional Rights* ......................................5

        3. *Lies and Pressure* ...................................................................6

    B. Tobias Seeks Vindication In this Suit ...........................................6

ARGUMENT ..........................................................................................8

    I.    The Majority's Opinion Contradicts Established Law ..............8

        A.  Conflicts With *Crowe*, *Stoot*, and *Cooper*................................8

        B.  Conflicts With *Tingle, Collazo*, and *Harrison* ......................10

        C.  Conflicts By Granting Qualified Immunity After Recognizing Tobias Invoked His Rights.....................................................11

        D.  Conflicts By Applying the Wrong Qualified Immunity Standard.................................................................................14

    II.    The Panel Majority Exceeded its Jurisdiction ..........................16

    III.   Fabricating a Confession is Plainly Unconstitutional..............17

CONCLUSION ........................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*Arizona v. Roberson,* 486 U.S. 675 (1988) .............................................. 12

*Ashcroft v. al–Kidd*, 563 U.S. 731 (2011) ............................................... 15

*Blackburn v. Alabama*, 361 U.S. 199 (1961) ..................................... 1, 14

*Brown v. Mississippi*, 297 U.S. 278 (1936) .................................. 1, 18, 20

*California Attorneys for Criminal Justice v. Butts,* 195 F.3d 1039
    (9th Cir. 1999) ............................................................................ 1, 13

*Castellano v. Fragozo,* 352 F.3d 939 (5th Cir. 2003) (*en banc*)........... 1, 19

*Chavez v. Martinez,* 538 U.S. 760 (2003) ................................................ 13

*Collazo v. Estelle*, 940 F.2d 411 (9th Cir. 1991) (*en banc*).............. *passim*

*Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (*en banc*) ..... 1, 8, 10, 11

*Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101
    (9th Cir. 2010) ................................................................................. 18

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir 2010) .......... *passim*

*Davis v. United States*, 512 U.S. 452 (1994) .......................................... 12

*Devereaux v. Abbey*, 263 F.3d 1070
    (9th Cir. 2001) (*en banc*).................................................... 1, 2, 18, 19

*Edwards v. Arizona*, 451 U.S. 477 (1981) .............................................. 12

*Fare v. Michael C.*, 442 U.S. 707 (1979) ............................................... 12

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) .................................. 19

*Gallegos v. Colorado*, 370 U.S. 49 (1962) .................................................... 9

*George v. Morris*, 736 F.3d 829 (9th Cir. 2013) ...................................... 17

*Hall v. City of Los Angeles*, 05-CV-1977. ............................................... 20

*Hall v. City of Los Angeles*, 697 F.3d 1059 (9th Cir. 2012).................... 19

*Halsey v. Pfeiffer*, 750 F.3d 273 (3rd Cir. 2014).................................. 1, 19

*Henry v. Kernan*, 197 F.3d 1021 (9th Cir. 1999).............................. 13, 16

*Hope v. Pelzer*, 536 U.S. 730 (2002) ....................................................... 15

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ........................................... 17

*In re Gault,* 387 U.S. 1 (1967) ................................................................ 9

*Johnson v. Jones*, 515 U.S. 304 (1995)..................................... 1, 2, 16, 17

*Koh v. Ustich*, 933 F.3d 836 (9th Cir. 2019) .......................................... 17

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) .......................... 17

*Malloy v. Hogan*, 378 U.S. 1 (1964) .................................................. 1, 10

*Michigan v. Moseley*, 423 U.S. 96 (1975) ............................................... 12

*Miranda v. Arizona*, 384 U.S. 436 (1966) ......................................... 5, 10

*Mitchell v. Forsyth*, 472 U.S. 511 (1985)............................................... 17

*Napue v. Illinois*, 360 U.S. 264 (1959) .................................................. 18

*Ricciuti v. NYC Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) ............. 1, 19

*Rodriguez v. McDonald*, 872 F.3d 908 (9th Cir. 2017) .......................... 13

*Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2015) (*en banc*) ............... 1, 17

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009) .................... *passim*

*United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994)............... 1, 10, 15

*United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981) .......... 1, 10, 14, 15

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004) ............................ 11

*Ziglar v. Abbasi,* 137 S. Ct. 1843 (2017) ................................................ 15

# RULE 35(b) STATEMENT

Rehearing *en banc* is required to maintain uniformity of the law and because this matter involves questions of exceptional importance. The panel decision conflicts with many authorities, including:

- *Johnson v. Jones*, 515 U.S. 304 (1995); *In re Gault,* 387 U.S. 1 (1967); *Malloy v. Hogan*, 378 U.S. 1 (1964); *Gallegos v. Colorado*, 370 U.S. 49 (1962); *Blackburn v. Alabama*, 361 U.S. 199 (1961); *Brown v. Mississippi*, 297 U.S. 278 (1936);

- *Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir 2010); *Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009); *Devereaux* v. *Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (*en banc*); *California Attorneys for Criminal Justice v. Butts,* 195 F.3d 1039 (9th Cir. 1999); *United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994); *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992)(*en banc*); *Collazo v. Estelle*, 940 F.2d 411 (9th Cir. 1991) (*en banc*); *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981);

- *Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2015) (*en banc*); *Ricciuti v. NYC Transit Auth.*, 124 F.3d 123 (2d Cir. 1997); *Halsey v. Pfeiffer*, 750 F.3d 273 (3rd Cir. 2014); and *Castellano v. Fragozo,* 352 F.3d 939 (5th Cir. 2003) (*en banc*).

# INTRODUCTION

At age 13, Art Tobias was interrogated by a team of Detectives who: made false promises; threatened a harsher sentence if he refused to confess; ignored his requests to be silent; denied Tobias's request for an attorney; and pressured, yelled, lied to, and swore at him to compel a confession. In *Crowe v. County of San Diego,* this Court held that when a juvenile is "cajoled, threatened, lied to, and relentlessly pressured by teams of police officers" into confessing, the interrogators are not entitled to qualified immunity. 608 F.3d 406, 432 (9th Cir 2010). The year before, *Stoot v. City of Everett*, reached the same conclusion. 582 F.3d 910 (9th Cir. 2009). Yet, contrary established law, and over Judge Wardlaw's dissent, the panel majority granted qualified immunity.

In so doing, the panel rejected facts the District Court found, exceeding interlocutory jurisdiction under *Johnson v. Jones*, 515 U.S. 304 (1995). The panel also excused Detectives for fabricating evidence, despite the trial court finding a triable fact that Detectives prosecuted Tobias while knowing he was innocent, contrary to *Devereaux* v. *Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (*en banc*).

Rehearing *en banc* is necessary.

# BACKGROUND

## A. Detectives Interrogate and Wrongfully Convict a Child

In August 2012, Alex Castaneda was shot and killed in Los Angeles. 2ER 124, ¶61.[1] Surveillance footage captured the shooter—a heavyset adult male—firing at Castaneda and the others. *Id.* ¶63.

Tobias had nothing to do with the homicide; was a skinny 13-year-old child who had never been arrested; and was obviously not the heavyset perpetrator in the video. *Id.* ¶¶60-68, 70, 140.

Nonetheless, Detectives arrested Tobias and interrogated him with "guilt presumptive, psychologically manipulative, and confession driven techniques." *Id.* ¶¶130-32, 139. Detectives made threats and promises, yelled at, and intimidated Tobias. *Id.* ¶160-163. In addition, Detectives ignored Tobias's efforts to remain silent, denied his requests for an attorney and his mother, *id.* ¶¶154-55, 159, 161, 166, 179; and insisted Tobias was the shooter despite persistent denials, *id.* ¶¶148,

---

[1] Paragraph citations are to Tobias's response to Detectives' statement of facts at pages 94-176 of Excerpt of Records ("ER"). Remaining citations correlate to the batesnumber in the ER or Plaintiff's Excerpt of Record ("PER"). Citations to the panel decision and opinion below are to the Appendix to this petition, designated "A."

153, 156. Detectives also lied, falsely claiming Tobias's friends and mother implicated him from surveillance video. *Id.* ¶¶143, 147, 157-58.

The interrogation video depicts a team of armed detectives using harsh, coercive methods while Tobias was handcuffed in the corner of a small room. 4PER 448; 2ER ¶¶127, 163-164. These include:

*1. Threats and Promises.* Detectives threatened that if Tobias did not confess, he would receive a harsher sentence and look like a "cold blooded killer." 2ER, ¶160. Detectives also falsely claimed Tobias would receive leniency ("help") for confessing. *Id.* ¶162. For example:

- Threat and promise: "Do you think they're going to throw away the key on you? No. They're going to try to get you some help. You're going to go to [juvenile detention] and they're going to try to get you some help. But we can't help you if you're going to sit there and lie and – just be a cold-blooded killer." *Id.* 1408-09.

- Threat: "You're full of shit. And when this case is presented to a district attorney's office they're going to see you're a cold-blooded killer . . . . They're going to see that you're a gangster who lies, who kills people, who has no compassion, who fucking doesn't give a shit." 10PER 1413.

- Threat and promise: "I don't know what it takes to get into -- into your mind here but when we write this up we're going to write it how -- how it is. And right now it looks like you're a cold blooded MS gangster who doesn't give a fuck, who is down for the hood. That's what it's going to look like. . . . So when the judge looks at the case you think he's going to give a fuck about you?" *Id.* 1426.

- Threat: "It's going to look like you're down – You're so far down for the hood that you didn't want to speak so they might throw the book at you." *Id*. 1419.

- Threat and promise: "But listen, you need to man up. You -- you got your mom [into this]. You got Officer East in this. You got some of your homeys in this fucking mess. Okay? You're 13 years of age. You're a young kid. The court is going to take that into consideration. But you can't sit here and lie to Detectives. You can't do that. That's making you look like a cold blooded killer. Think about that. Okay? You need to tell us what happened.".

Detectives further threatened that Tobias's family would suffer if he refused to confess. *Id* 1405. at 1401-02, 14015, & 1414.

*2. Invocation of Constitutional Rights.* Tobias was given cursory *Miranda* warnings, followed by immediate questioning. ER, 147, at ¶¶146-47. He was never asked for, and never provided, a waiver of his rights. *Id*. Even then, after requests to see his mom were denied, *id*. ¶¶ 155, 161, 166, & 170, Tobias twice told Detectives he wanted to be silent; questioning continued unabated. 10PER 1414-15.

Tobias also explicitly requested an attorney. During aggressive accusations, ¶149, Tobias interrupted and asked: "Could I have an attorney? Because that's not me." *Id*. ¶150. The response was "But— okay. **No.** Don't worry. You'll have an opportunity." *Id*. The questioning immediately continued. A9.

*3. Lies and Pressure.* Detectives repeatedly pressured Tobias, including with lies and false evidence ploys to create a sense of hopelessness and make him believe he had to say what they wanted. PER at 438-39. Such pressure was present from start to finish. *Id.* at 1391-93, 1400, 1405, 1418, 1422.

Tobias eventually succumbed and falsely confessed to the facts Detectives fed him. ER ¶¶168-71. Tobias was then prosecuted and convicted with the false confession. On appeal, the conviction was overturned because the confession was obtained in violation of the Fifth Amendment. *Id.* ¶¶60, 214; 7PER 992-1016. The charges were dismissed. 2ER ¶214.

## B. Tobias Seeks Vindication In this Suit

This suit followed. Discovery revealed, among other things, that the day after the interrogation, LAPD officers arrested a heavyset adult male with the Castaneda murder weapon. Detectives suppressed this evidence of innocence and continued their fabrications. 2ER ¶¶190-194, 204-12. Summary judgment was denied on Tobias's *Brady* and fabrication theories. A.15-18.

Concerning the interrogation, the District Court made the following findings:

> The video shows that Plaintiff—who was only thirteen years old at the time—was subjected to an interrogation in which he was sworn at, lied to, repeatedly pressured, told his mother was uncontrollably crying and had identified him as the shooter, repeatedly called a "cold-blooded killer," had his request for counsel ignored (and implicitly denied), and was told that if he didn't confess the judge would give him a longer sentence.

A.12. Qualified immunity was unavailable. A.23.

On interlocutory appeal, the panel majority recognized that, under clearly established law, Tobias invoked his Fifth Amendment right to counsel, which was ignored. A.29. The panel nonetheless went on to conclude Detectives were entitled to qualified immunity for the subsequent interrogation. A.30. In dissent, Judge Wardlaw recognized that "in light of *Crowe*, every reasonable officer would also have understood that the interrogation tactics here were unconstitutionally coercive, in violation of the Fifth Amendment." A.39.

# ARGUMENT

## I.    The Majority's Opinion Contradicts Established Law

### A. Conflicts With *Crowe*, *Stoot*, and *Cooper*

Before 2012, it was clearly established that employing a litany of coercive tactics against a juvenile could produce involuntary statements. Thus, *Crowe* held: "In 1998, when defendants interrogated Michael and Aaron, the clearly established rule in this Circuit was that a § 1983 cause of action for a violation of the Fifth Amendment's Self–Incrimination Clause arose as soon as police employed coercive means to compel a statement." 608 F.3d at 431.

*Crowe* relied on *Stoot*, which held that an officer conducting a 2003 interrogation "was on notice under clearly established law that if he . . . physically or psychologically coerced a statement from [the juvenile plaintiff], the use of the confessions could ripen into a Fifth Amendment violation." *Stoot*, 582 F.3d at 927.

This Court reached the same conclusion in *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (*en banc*). There, qualified immunity was unavailable where officers "ignored Cooper's repeated requests to speak with an attorney, deliberately infringed on his Constitutional right to

remain silent, and relentlessly interrogated him in an attempt to extract a confession." *Crowe*, 608 F.3d at 867 (citation omitted).

The majority's opinion conflicts with this established law. Indeed, the District Court's findings are remarkably similar to *Crowe*. There, as the Judge Wardlaw's dissent recognized, this Court denied qualified immunity where juveniles were "cajoled, threatened, lied to, and relentlessly pressured by teams of police officers." A.38. Here, Tobias "was subjected to an interrogation in which he was sworn at, lied to, repeatedly pressured, told his mother was uncontrollably crying and had identified him as the shooter, repeatedly called a 'cold-blooded killer.'" *Id*. The interrogation here was more coercive than *Crowe*: Tobias was younger than the children in *Crowe* (and *Stoot*), and only Tobias requested an attorney but was told "no."[2]

These conflicts demand *en banc* review.

---

[2] It is established juveniles are more susceptible to having their will overborne, requiring they be interrogated with great care. *In re Gault,* 387 U.S. 1, 55 (1967). Nonetheless, Detectives took *no* concern for Tobias's age as they interrogated him; a "callous disregard" of his rights. *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962).

## B. Conflicts With *Tingle, Collazo*, and *Harrison*

The District Court found Tobias was told "if he didn't confess the judge would give him a longer sentence." A.12. This was *itself* unlawful under clearly established law in 2012. Threatening a suspect with punishment for silence has long been condemned—it is "impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 468 n.37. (1966); *see also Malloy v. Hogan*, 378 U.S. 1, 8, (1964) (suspect must "suffer no penalty" for silence).

Indeed, "[t]here are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." *United States v. Harrison*, 34 F.3d 886, 891-92 (9th Cir. 1994); *cf. Collazo v. Estelle*, 940 F.2d 411, 417 (9th Cir. 1991) (*en banc*) ("It follows as night the day" an officer's "attempt in the police station to impose a penalty on [the plaintiff's] choice to remain silent amounts to a serious infringement of [his] Fifth Amendment right."). In 1981, *Tingle* likewise explained that although it might be permissible to tell a suspect that cooperation would be communicated to authorities,

the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the Fifth Amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence.

658 F.2d at 1336 n.5.

Clearly, as the District Court found ("if he didn't confess the judge would give him a longer sentence," A.12) and the video amply shows (*e.g.*, "you didn't want to speak so they might throw the book at you," 10PER 1419), Tobias was repeatedly told he would be punished if he refused to confess. Detectives were on notice doing so violates the Fifth Amendment.[3] The panel decision contradicts these authorities.

## C. Conflicts by Granting Qualified Immunity After Recognizing Tobias Invoked His Rights

The panel held "the district court correctly denied qualified immunity on Tobias's claim that Defendants violated his Fifth Amendment right to counsel by continuing his custodial interrogation

---

[3] Detectives also had notice making false promises in combination with threats was coercive. *Williams v. Woodford*, 384 F.3d 567, 595 (9th Cir. 2004) (A "promise of leniency accompanied by threats or other coercive practices constitutes improper influence and makes a subsequent inculpatory statement involuntary.").

after he requested an attorney and then using the resulting confession against him in his criminal case." A.29 (citing *Davis v. United States*, 512 U.S. 452, 458-59 (1994), and *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). Detectives violated the "rigid rule" that "an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Fare v. Michael C.*, 442 U.S. 707, 719 (1979).

Once the panel recognized Detectives ignored Tobias's invocation and continued their questioning, the only remaining question was whether Detectives were on *notice* that doing so could render a subsequent confession involuntary under the Fifth Amendment. They certainly were. *See Arizona v. Roberson,* 486 U.S. 675, 681-84 (1988) (invocation of counsel creates presumption that suspect cannot bear the "inherently compelling pressures" of interrogation); *Michigan v. Moseley*, 423 U.S. 96, 104-06 (1975) (voluntariness depends on whether the right to cut off questioning was "scrupulously honored").

Indeed, *Collazo* held ignoring an invocation and continuing interrogation and pressure did not "scrupulously honor" the right to end questioning but "stepped on it." *Collazo*, 940 F.2d at 417. Accordingly,

"[a]ny minimally trained police officer should have known such pressure was improper and likely to produce involuntary statements." *Id.* Likewise, *Henry v. Kernan*, held ignoring an invocation rendered a subsequent confession involuntary, as a reasonable officer would have known. 197 F.3d 1021, 1028 (9th Cir. 1999).

Given *Collazo* and *Henry,* this Court previously denied qualified immunity to officers who ignored an invocation and continued interrogating. *California Attorneys for Criminal Justice v. Butts,* 195 F.3d 1039, 1047-49 (9th Cir. 1999), *abrogated on other grounds by Chavez v. Martinez,* 538 U.S. 760 (2003); *cf. Rodriguez v. McDonald*, 872 F.3d 908, 926 (9th Cir. 2017) (finding involuntary a confession in 2006 where officers ignored an voluntary because when officers ignore an invocation of counsel any subsequent confession "is presumptively invalid" (citing *Roberson*, 486 U.S. at 681)).

That should have ended the immunity analysis. Tobias has advanced one Fifth Amendment count; Detectives are not entitled to qualified immunity on that *count*. Any reasonable officer knew that refusing to honor an invocation and continuing questioning, alone, could cause a Fifth Amendment violation. In short, the panel's holding on the

invocation issue was independently sufficient to deny qualified immunity on this entire count because Detectives had ample notice that the resulting confession would likely be deemed involuntary.

### D. Conflicts By Applying the Wrong Qualified Immunity Standard

The panel seemed to rest its decision, in part, on the fact Tobias was not beaten. A.32. This standard, advocated by Detectives, is contrary to law. *Blackburn v. Alabama*, 361 U.S. 199, 206 ("[T]his Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition."). Indeed, "conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will"—subtle "psychological coercion suffices as well, and at times more effectively, to overbear a rational intellect and a free will." *Tingle*, 658 F.2d at 1335.

Moreover, the panel erred by granting qualified immunity because this Court had not previously encountered an interrogation with the *exact* mix of coercive tactics present here. A.33-34 ("the particular circumstances of the interrogation do not present the same sort of

confluence of features that we have previously held to be coercive").[4] The Supreme Court has emphasized qualified immunity, at core, concerns notice in the context of a particular case, *Tolan*, 572 U.S. at 655-56, and has repeatedly reminded courts that a case exactly "on point" is not required. *See Ziglar v. Abbasi,* 137 S. Ct. 1843, 1866-67 (2017); *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011); *Hope v. Pelzer*, 536 U.S. 730 (2002).

Myriad authorities—*e.g.*, those above—provided Detectives' beyond-sufficient notice. That there are slight variations between this interrogation and others where a Fifth Amendment violation was found is not dispositive. Of course there are slight variations; no two interrogations are exactly the same. But here, similar interrogation tactics used on juveniles in *Crowe* and *Stoot* were used against Tobias, precluding qualified immunity. In addition, threats of punishment for remaining silent—deemed unconstitutional in *Collazo*, *Harrison*, and *Tingle*—were used against Tobias, independently precluding qualified

---

[4] The panel noted the interrogation was "only" 90 minutes, but drew the wrong inference from this fact. That it took "only" 90 minutes to coerce Tobias to falsely confess illustrates how vulnerable he was and how overwhelmingly coercive Detectives' actions were, not the other way around.

immunity. The disregard of a request for counsel, present in *Collazo*, *Henry*, and *Collazo* also independently preluded qualified immunity.

Yet, the panel appears to have adopted a novel principle: that an officer engaged in multiple sets of conduct that are each independently prohibited under clearly established law can invoke qualified immunity by being audacious enough to be the first to engage in them *in combination*. This is both illogical and untenable, with far-reaching ramifications that conflict with established precedent.

## II.    The Panel Majority Exceeded its Jurisdiction

The court below made findings about the interrogation of Tobias. A.12. However, the panel's factual recitation ignores many of these facts while minimizing others. For example, the panel ignores that Tobias was threatened with a longer sentence if he did not confess and promised "help" if he did. The panel ignored that Tobias was "sworn at, lied to, repeatedly pressured." And, the facts the majority mentioned are minimized—*e.g.*, threats are treated as "bluffing."

The panel's analysis thus rejects the factual findings of the District Court and fails to construe the facts favorably to Plaintiff. The panel lacked authority to do so. *See Johnson v. Jones*, 515 U.S. 304, 311

(1995). Interlocutory review is confined to purely legal questions and cannot implicate "the plaintiff's version of the facts." *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013). Thus, the panel's decision exceeded its narrow interlocutory jurisdiction, contrary to these authorities.

The panel's rejection of Plaintiff's facts and those found below conflicts with *Stinson v. Gauger*, 868 F.3d 516, 525 (7th Cir. 2015) (*en banc*), which held *Johnson* prohibits such reexamination of factual findings in an interlocutory appeal. Tellingly, in analogous situations— a videotaped interrogation involving threats and other coercive acts where officers contest how to interpret the video—the Seventh Circuit has found jurisdiction lacking and denied qualified immunity. *Koh v. Ustich*, 933 F.3d 836 (9th Cir. 2019); *Hurt v. Wise*, 880 F.3d 831, 839 (7th Cir. 2018), *abrogated on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019). Review is necessary to correct this conflict.

## III.   Fabricating a Confession is Plainly Unconstitutional

Tobias contends the confession was not only involuntary but *also* fabricated because (1) Detectives supplied him the substantive facts of

the confession and (2) the false evidence was generated despite his obvious innocence.

There "is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux* v. *Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (*en banc*); *Napue v. Illinois*, 360 U.S. 264 (1959) (holding "a conviction obtained through use of false evidence" violates due process). This rule applies to confessions. *Brown v. Mississippi*, 297 U.S. 278 (1936).

Under established precedent, Tobias can prove fabrication in three ways: (1) deliberately; (2) circumstantially, by pointing to evidence created despite officers' knowing Tobias was innocent; or (3) circumstantially, where evidence is created through abusive techniques officers should have known would yield false information. *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010).

Tobias submitted evidence on the first route: Detectives directly fabricated evidence by feeding Tobias the details of the crime, which would not have been a part of the confession otherwise (since Tobias was innocent). ER ¶¶169-70

Tobias also submitted evidence on the second: Detectives knew or should have known he was innocent, and yet continued their efforts to prosecute (and frame) him. PER 56-572, 222-23; ER ¶¶69, 101, 140, 183, 190-92, 204-12. Accordingly, applying *Devereaux*, the trial court denied summary judgment on this basis. A.18.

The panel's grant of qualified immunity—which did not address route two or the trial court's finding on this issue—conflicts with *Devereaux*, which acknowledges fabrication can be proven outside of coercion. In conflating *fabrication* with *coercion*, the panel decision conflicts with decisions in other Circuits that recognize a confession can be fabricated even if not coerced. *See Ricciuti v. NYC Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Halsey v. Pfeiffer*, 750 F.3d 273, 284 (3rd Cir. 2014); *Castellano v. Fragozo,* 352 F.3d 939, 943, 958 (5th Cir. 2003) (*en banc*); *cf. Fields v. Wharrie*, 740 F.3d at 1110 ("Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false.").

On the third route, the panel misapplied *Hall v. City of Los Angeles*, 697 F.3d 1059 (9th Cir. 2012). There, this Court held a coercion

claim could not be bootstrapped into one of fabrication for the first time on appeal. The sole claim below was "Detectives coerced [Hall's] confession." *Id.*; *see Hall v. City of Los Angeles*, 05-CV-1977, Dkt. 248, ¶46. Unsurprisingly, when Hall tried to change his claim—to "recast" it was one for fabrication—this Court recognized the shoe did not fit and rejected the attempt.

By contrast, Tobias has always alleged, and then sufficiently adduced evidence of, fabrication related to the false confession procured by Detectives. ER 207-08, 220 (Second Amended Complaint), A.18 (decision below). *Hall* did nothing to preclude a fabrication claim related to a false confession or the fact fabricating one violated established law. *Brown*, 297 U.S. 278.

## CONCLUSION

Rehearing *en banc* is warranted here.


Dated: May 1, 2020

Respectfully submitted,

**ART TOBIAS**

By: <u>/s/ David B. Owens</u>

David B. Owens
Cal. Bar No. 275030
david@loevy.com
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
(312) 243-5902 (Fax)

## CERTIFICATE OF COMPLIANCE

I, David B. Owens, certify pursuant to Federal Rule of Appellate

Procedure 35(b)(2)(a) that this PLAINTIFF-APPELLEE'S

ANSWERING BRIEF contains, 3,888 words, excluding items exempted

from by Fed. R. App. P. 32(f). The brief's type size and type face comply

with Fed. R. App. P. 32(a)(5) and (6).


/s/ David B. Owens                     **Dated**: <u>May 1, 2020</u>

## CERTIFICATE OF SERVICE

I, David B. Owens, an attorney certify that, on May 1, 2020, I caused the foregoing to be filed via the Court's electronic filing system, which effected service on all counsel of record.

/s/ David B. Owens          **Dated**:    May 1, 2020

No. 18-56360

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

———————————

ART TOBIAS,

*Plaintiff-Appellee,*

v.

MICHAEL ARTEAGA,
Detective No. 32722; et al.,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court
for the Central District of California
No. 2:17-cv-001076-DSF-AS, Hon. Dale S. Fischer

---

**APPENDIX OF PLAINTIFF-APPELLEE ART TOBIAS**

---

Anand Swaminathan
David B. Owens
Megan Pierce
LOEVY & LOEVY
311 N. Aberdeen St, Third Fl
Chicago, Illinois 60607
(312) 243-5900

## TABLE OF CONTENTS TO PLAINTIFF-APPELLEE'S APPENDIX

District Court Order on Summary Judgment issued September 17, 2018........A.1

9th Circuit Panel Decision issued February 25, 2020.............................................. A.25

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ART TOBIAS,<br>　　　Plaintiff,<br><br>　　　　v.<br><br>CITY OF LOS ANGELES, et al.,<br>　　　Defendants. | Case No. 17-1076 DSF (ASx)<br><br>Order DENYING the Motions for Summary Judgment of the City of Los Angeles and Officers Born, Cooley, and East (Dkts. 99 and 100) and GRANTING in Part and DENYING in Part the Motion for Summary Judgment of Detectives Arteaga, Cortina, Motto, and Pere (Dkt. 111) |

## I.　BACKGROUND

Plaintiff Art Tobias sues Officer Born, Officer Cooley, Officer East, Detective Arteaga, Detective Cortina, Detective Motto, Detective Pere, and the City of Los Angeles (collectively, Defendants) for violation of his civil rights.  Dkt. 67, Second Am. Compl. (SAC).  Plaintiff alleges Defendants deprived him of his rights under the U.S. Constitution by:  (1) forcing him to falsely incriminate himself and denying his right to counsel; (2) subjecting him to coercive custodial interrogation and generating an involuntary and false confession; (3) fabricating evidence and deliberately withholding exculpatory evidence; (4) acting without probable cause, which caused him to be maliciously prosecuted; (5) failing to intervene; and (6) conspiring to deny him of his

constitutional rights. Plaintiff also alleges a <u>Monell</u> policy/failure to train claim against the City of Los Angeles.[1]

Defendants move for summary judgment or, in the alternative, partial summary judgment. <u>See generally</u> Dkts. 99 (filed by the City of Los Angeles, Officer Born, and Officer Cooley), 100 (filed by Officer East), and 111 (filed by Detective Arteaga, Detective Cortina, Detective Motto, and Detective Pere).

## II.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "This burden is not a light one." <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 387 (9th Cir. 2010).

A "district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." <u>Chevron Corp. v. Pennzoil Co.</u>, 974 F.2d 1156, 1161 (9th Cir. 1992). Instead, the court views the evidence in the light most favorable to the nonmoving party.[2] <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987). "Put another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." <u>Id.</u> at 631.

---

[1] Plaintiff has abandoned his <u>Monell</u> claim related to alleged <u>Brady</u> violations or based on a pattern of constitutional violations. <u>See</u> Dkt. 138 (Opp'n) at 3 n.1.

[2] The parties submit evidence that is neither relevant nor helpful. All parties raise numerous objections to the evidence. The Court does not consider any evidence that could not be presented in admissible form at trial.

# III. UNDISPUTED FACTS

## A. The Castaneda Murder

Alex Castaneda was shot and killed in the early morning hours of August 18, 2012. Detective UF ¶ 1.[3] Homicide Detectives Pere and Motto were notified of the incident at approximately 1:15 a.m., and were dispatched to the scene to investigate. Id. ¶¶ 2, 3; Pl. Ex. 1 (Arrest Report) at 000199. The investigation revealed a security camera on an adjacent building, which had captured one of the two suspects in the act of shooting. Id. ¶ 4.

## B. Officer Born and Officer Cooley Identify Plaintiff

Since the shooting appeared to be gang-related, Officer Cooley—a gang enforcement officer—was asked to review the surveillance video. Detective UF ¶ 5; Officer Ex. A (Cooley Decl.) ¶¶ 3, 6. By chance, Officer Cooley had seen Plaintiff the day before, when Plaintiff's mother came into the station to report him missing. Officer UF ¶¶ 2, 3; Pl. Ex. 27 (Cooley Statement Form) at 00473. Officer Cooley was not provided with any information about the potential suspect, except that he was a potential MS-13 gang member. Officer UF ¶ 7. Officer Cooley reviewed the video and stated the shooter was Plaintiff. Id. ¶ 8.

Because Officer Cooley had never met Plaintiff, he contacted Officer Born (a gang enforcement officer in Olympic division) to have her review the video. Id. ¶ 9. Officer Cooley believed Officer Born might know Plaintiff because she had input his Field

---

[3] Detective UF refers to Detectives' Statement of Uncontroverted Facts and Conclusions of Law (Dkt. 111-2). East UF refers to Officer East's Statement of Uncontroverted Facts and Conclusions of Law (Dkt. 100-1). Officer UF refers to the City of Los Angeles and Officers Born and Cooley's Statement of Uncontroverted Facts and Conclusions of Law (Dkt. 99-1). Pl. UF refers to Plaintiff's Statement of Uncontroverted Facts (Dkt. 131).

Identification cards.  Id.; Cooley Decl. ¶ 8; Pl. Ex. 33 (Tobias FI Card) at LAPD 2327, 2328.  Plaintiff's FI Card described him as four feet eleven inches tall with a medium build, bushy hair, and dark framed reading glasses.  Officer UF ¶ 19.  Officer Born had never met Plaintiff, but had previously seen a "few photos" of him, as well as his Facebook page.  Id. ¶ 18; Pl. Ex. 30 (Born Dep. Tr.) at 30:20-34:2.

When Officer Born arrived on scene, she was shown a still photo of the surveillance footage, from which she identified Plaintiff.  Officer UF ¶ 22; Officer Ex. B (Born Decl.) ¶ 9.  Officer Born then reviewed the surveillance video and believed the suspect to be Plaintiff.  Id.  Officer Born wrote up a statement form identifying Plaintiff, but otherwise was not involved in his criminal case.  UF ¶¶ 23-25; Born Decl. ¶¶ 9, 10; Officer Ex. H (Born Statement Form).

At some point, Officer Cooley completed a statement form. Although Officer Cooley remembers completing the form on August 18, 2012, the statement form in Plaintiff's possession has a date of September 14, 2012.  Compare Officer Ex. E (undated Statement Form), with Pl. Ex. 27 (9/14/12 Statement Form). Officer Cooley testified at Plaintiff's criminal trial with respect to Plaintiff's alleged gang affiliation, but not to his identification on the day of the shooting.  Officer UF ¶ 13.

## C. Officer East Identifies Plaintiff

On August 20, 2012, Detectives Motto and Arteaga visited Plaintiff's school to see if anyone could identify him from the surveillance video.  Id. ¶¶ 4-5.  The principal recommended Officer East of the Los Angeles Unified School District, and Assistant Dean Roger Negroe.  Id. ¶ 6.  Before showing him the surveillance video, Detectives told Officer East they believed the suspect was a current student.  Id. ¶ 9; Pl. Ex. 6 (East Transcript) at 4:16-20.

4

Officer East watched the video several times before identifying Plaintiff:

> Officer East:  I have a hard time IDing that person.
>
> Detective Motto:  Okay.  No problem.
>
> Officer East:  I mean, the full head of hair is throwing me off a little bit.
>
> Detective Motto:  Okay.
>
> Officer East:  Unless he shaved it and he did have more hair last week.
>
> Detective Motto:  Who are you thinking of?
>
> Officer East:  The guy that I was thinking is a lot smaller in stature, though.
>
> Detective Motto:  Okay.
>
> Officer East:  It's Art Tobias.
>
> Detective Motto:  That's who we think it is.
>
> Officer East:  (Laughter.)  But, I mean, God, he's so much smaller in real life.

East UF ¶ 10; East Transcript at 10:14-11:5.  Officer East told Detectives that Plaintiff had "just recently" shaved his head.  East UF ¶ 11; East Transcript at 11:8-10.  Officer East then watched the video again:

> Officer East:  Yeah.  The photo – The photo makes him look a little bit more bigger [sic] and stockier.  But from that photo right there . . .
>
> Detective Motto:  Let me run it all the way through again.  Let's see what happens, and then you can watch the whole thing and see him move.

> Officer East:  I guess it looks very deceiving probably.
>
> Detective Motto:  Always.
>
> Detective Arteaga:  Yes.  What did you say was throwing you off, the hair?
>
> Officer East:  No.  I thought maybe he looked, like, taller and bulkier in the camera, which could be distorting through the mega pixels.

East Transcript at 14:16-15:3.

Officer East left the room when Negroe was interviewed. East UF ¶ 14.  Negroe, who was not aware that Officer East had identified Plaintiff, viewed the surveillance video but could not identify anyone.  Id. ¶¶ 18, 19; East Transcript at 21:19-21 ("And you said he's a Berendo student?  I can't picture anybody like that right now."), 22:23-24 ("But if I – You know.  He's chubby, I can tell you that.  But . . . ").  After leaving the office, however, Negroe saw Plaintiff, whom he believed to be the individual in the video, and informed Detectives.  East UF ¶ 20; Dkt. 100-2 (Negroe Decl.) ¶ 8.  Detectives then detained Plaintiff; East detained the student with Plaintiff and drove him to the LAPD station.  East UF ¶ 22. East was not involved in Plaintiff's subsequent interrogation.  Id. ¶ 23.

Detectives asked Officer East to prepare a statement, which he did on either August 20 or 21.  Pl. Exs. 10 (East Dep. Tr.) at 69:17-70:23, 45 (Motto Dep. Tr.) at 116:20-117:14.  Officer East stated he watched the surveillance video "several times," was "fairly sure" the suspect was Plaintiff, and "[t]he Person in the video had a distinct walk and stature which is similar to that of Art Tobias."  East Ex. G (East Statement).  Negroe's statement notes that after watching the video he "couldn't remember the name of the student," but he was able to identify Plaintiff when he

left to go back to his office.  East. Ex. D (Negroe Statement).  East declares he dropped off his and Negroe's statements on September 4, 2012, but the LAPD follow-up report states Detective Cortina received those reports on August 24, 2012.  Compare East UF ¶ 32; East Decl. ¶ 16, with Pl. Ex. 71 at LAPD 2279.

After August 20, 2012, East did not speak with any Defendant aside from Detective Cortina.  East UF ¶ 29.  East testified at Plaintiff's trial as to Plaintiff's alleged truancy, but not to his identification of Plaintiff in the surveillance video.  Id. ¶ 40.

### D. Detective Arteaga Interviews Plaintiff's Mother

Either before or while Plaintiff was being questioned, Detective Arteaga questioned Plaintiff's mother, Helen Contreras.  Detective UF ¶ 29; Pl. Exs. 16A and 16B (Contreras Transcript), 17 (Contreras Interview).  Detective Arteaga showed Contreras the still image of the suspect from the surveillance video:

> Detective Arteaga:  I told you we would be looking for your son.  Who's that (indicating)?

> Ms. Contreras:  (Viewing Laptop.)  That's not him.  That's not what he was wearing that day when he came home.

> Detective Arteaga:  No.  He Changed.

> Ms. Contreras:  He changed?  But I spoke to the mom.

> Detective Arteaga:  Look at the time.  That's your son right there, right?

> Ms. Contreras:  Yeah.  Where was this, may I ask?

> Detective Arteaga:  It was in the Rampart Division.

> Ms. Contreras:  Was he doing some stuff in the street?

> Detective Arteaga:  He was with some bad people.

7

Ms. Contreras:  So he wasn't with Giancarlos.

Detective Arteaga:  Is that your son?

Ms. Contreras:  I don't know.  You're telling me it is, but I have no idea.  That's not what he was wearing when he came home.

Detective Arteaga:  But it looks like him, right?

Ms. Contreras:  I don't know.  I can't even see.  I can't see it.  He doesn't – that's not his – He doesn't even have – His shoes are Adidas.  He was wearing Adidas when he came home.  He was wearing Adidas.  He was wearing a black shirt, his Levis, and Adidas.  And I know Giancarlos.  Giancarlos is a really good kid.  He would never cover up for him like that.  He wouldn't do that.

Contreras Transcript at 26:18-27:24.

## E. **Detectives Pere and Cortina Interrogate Plaintiff**

Detectives transported Plaintiff to the police station, where he was placed in an interrogation room and handcuffed to a chair for more than an hour.  Pl. UF ¶ 127.  Plaintiff was questioned by Detectives Pere and Cortina, while Detectives Motto and Arteaga watched the interrogation via a monitor in another room.  Id. ¶ 131; Pl. Ex. 14 (Trial Transcript) at 77:25-28.

The entirety of Plaintiff's interrogation was recorded on video.  Detectives UF ¶ 24; Pl. Ex. 13 (Interrogation Transcript).  Detectives began the interrogation by asking Plaintiff background questions, such as his age, name, and address.  Interrogation Transcript at 3:13-8:13.  Detectives asked Plaintiff about his gang relationships and whether he knew right from wrong.  Id. at 9:12-20:18.

Detectives provided Plaintiff with the <u>Miranda</u> admonition before questioning him about the murder.  Detective UF ¶ 27; Interrogation Transcript at 21:20-22:9.  Detective Pere told Plaintiff his day "went from bad to worse" because a friend "rolled on him," i.e., implicated him in the crime.  Interrogation Transcript at 23:1-26-9.  Detectives showed Plaintiff the surveillance video and accused Plaintiff of being the shooter, which he repeatedly denied.  <u>Id.</u> at 26:9-30:23.  Eventually, Plaintiff stated, "Could I have an attorney?  Because that's not me," to which Detective Pere replied, "But – okay.  No, don't worry.  You'll have the opportunity;" Detective Cortina then immediately asked another question.  <u>Id.</u> at 31:4-9

After repeated denials, Plaintiff asked to speak with his mother.  <u>Id.</u> at 35:6.  Detective Pere said she was at the station, then the Detectives left the room.  <u>Id.</u> at 35:6-14.

## F. <u>Detective Arteaga Interrogates Plaintiff</u>

A few minutes later, Detective Arteaga entered and told Plaintiff he just spoke to his mother and she was "crying her eyes off."  <u>Id.</u> at 35:19-22.  Detective Arteaga also told Plaintiff that, among other things:  his mother and Officer East identified him from the surveillance video, lying made him look like a "cold blooded killer," and by lying Plaintiff would drag his family into the situation.  <u>Id.</u> at 36:2-6, 38:9-39:12.  After Plaintiff continued to deny any involvement, Detective Arteaga said:

> So listen, I'm done with your bullshit, okay?  I've been doing this for too damn long, okay? . . .  But you know what?  You're full of shit.  And when this case is presented to a district attorney's office they're going to see you're a cold blooded killer.  I don't know what they can do with you now.  They're going – they're going to see that you're a gangster who lies, who kills people,

who has no compassion, who fucking doesn't give a
shit.

Id. at 49:6-18.  Plaintiff again asked to speak with his mother, to
which Detective Arteaga repeated that she had identified him in
the video along with Officer East, Negroe, and an unknown
individual.  Id. at 52:18-55:14.  Detective Arteaga told Plaintiff if
he continued to lie, the court would "throw the book at [him]," but
if he told the truth, a judge would probably give him a lighter
sentence.  Id. at 55:1-57:23, 62:13-63:10.

Eventually, Plaintiff said he killed Castaneda.  Id. at 63:16-
86:14.  At that point, Detectives allowed Plaintiff to speak with his
mother.  Plaintiff told his mother he falsely confessed because
otherwise, Detectives would tell the judge he was a cold-blooded
killer and would get more time.  Id. at 88:19-89:24.

## G. Criminal Prosecution and Appeal

After Plaintiff confessed, Detective Cortina filled out a
Probable Cause Determination form, which was reviewed by
Detective Motto.  Pl. UF ¶ 184, Ex. 54 (Probable Cause Form).  In
support of probable cause, Detective Cortina wrote that "Officers
identified one of the shooters as being Art Tobias," and that
Plaintiff "confessed to the shooting."  Id.  On August 22, 2012,
Detective Cortina presented the criminal investigation file to the
intake District Attorney; charges were filed immediately
thereafter.  Detective UF ¶ 47.

Plaintiff was convicted of first-degree murder and two counts
of attempted murder.  Id. ¶ 52.  On February 11, 2015, the
California Court of Appeal, Second Appellate District, overturned
Plaintiff's conviction and ordered a new trial.  Pl. UF ¶ 214; Ex. 43
(Art T Decision).  Plaintiff was not re-tried.  Pl. UF ¶ 214.

### H. **LAPD's Policies and Practices**

LAPD's Juvenile Division is responsible for providing Department-wide training on issues related to juvenile policies and procedures. Officer UF ¶ 28. LAPD also maintains the Manual of Juvenile Procedures (Juvenile Manual), which contains policies and procedures relating to juveniles that officers are required to follow. Id. ¶ 29, Dkt. 99.2, Ex. C (Castillo Decl.) ¶ 5. Chapter 7 of the Juvenile Manual pertains to juvenile arrests, including the admonition of rights, requests for attorney services, Gladys R. statements, and notification of parents. Officer UF ¶ 30; Castillo Decl. ¶ 6; Officer Ex. L.

Detectives conducting homicide investigations are required to follow the Department Manual, the Detective's Operation Manual, the Homicide Manual, and the Juvenile Manual. Officer UF ¶ 44. All LAPD officers and detectives are trained to turn over any and all exculpatory evidence during criminal investigations; homicide detectives receive additional discovery instruction. Id. ¶¶ 45, 46; Jenks Decl. ¶ 8. It is also LAPD policy to hand over everything contained within the Murder Book to the District Attorney, who then provides it to defense attorneys. Officer UF ¶ 49; Jenks Decl. ¶ 13.

LAPD Policy 202.10 lays out its procedures for conducting a custodial interrogation. Officer UF ¶ 51. It is against LAPD policy to fabricate evidence or file false police reports. Id. ¶ 56.

## IV. DISCUSSION

### A. **Coercive Interrogation (First Count)**

Plaintiff's First Count alleges Detectives continued to question him after he requested an attorney and used coercive interrogation tactics to elicit a confession that was used against him in a criminal proceeding. SAC ¶¶ 166-72.

A coercive confession violates due process rights under the Fifth and Fourteenth Amendments of the Constitution. See Crowe v. Cty. of San Diego, 608 F.3d 406, 427, 446 (9th Cir. 2010); Stoot v. City of Everett, 582 F.3d 910, 922-23 (9th Cir. 2009). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is [actionable] under 42 U.S.C. § 1983." Tekoh v. Cty. of Los Angeles, 270 F. Supp. 3d 1163, 1176 (C.D. Cal. 2017) (quoting Ricciuti v. New York City, 124 F.3d 123, 130 (2d Cir. 1997)). "[U]nder the Fourteenth Amendment, an interrogation is coercive only when, in light of the totality of the circumstances, an officer's tactics are so extreme as to undermine a suspect's ability to exercise free will." Id. (citing Cunningham v. City of Wenatchee, 345 F.3d 802, 810 (9th Cir. 2003)).

After careful review of the video and transcript of Plaintiff's interrogation, the Court concludes Detectives Pere, Cortina, and Arteaga's motion for summary judgment as to this claim must be denied. The video shows that Plaintiff—who was only thirteen years old at the time—was subjected to an interrogation in which he was sworn at, lied to, repeatedly pressured, told his mother was uncontrollably crying and had identified him as the shooter, repeatedly called a "cold-blooded killer," had his request for counsel ignored (and implicitly denied), and was told that if he didn't confess the judge would give him a longer sentence. Viewing these facts in the light most favorable to Plaintiff, a rational trier of fact could decide that Plaintiff's interrogation violated his Fifth and Fourteenth Amendment rights.

Summary judgment is granted as to Detective Motto, however, because there is no evidence he participated in the

interrogation beyond dropping off a document and watching it from another room.

## B. Coercive Interrogation - Substantive Due Process (Second Count)

Plaintiff's Second Count alleges Detectives employed interrogation tactics that "shock[ed] the conscience," which caused Plaintiff to make false and involuntary statements implicating himself in the murder.  SAC ¶¶ 173-78.

"The standard for showing a Fourteenth Amendment substantive due process violation . . . is quite demanding."  <u>Stoot</u>, 582 F.3d at 928.  "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense' and therefore a violation of substantive due process."  <u>Id.</u> (quoting <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998)).  "More specifically, a Fourteenth Amendment claim of this type is cognizable only if the alleged abuse of power 'shocks the conscience' and 'violates the decencies of civilized conduct.'"  <u>Id.</u> (quoting <u>Lewis</u>, 523 U.S. at 846).

It a close call whether a reasonable juror could resolve this issue in favor of Plaintiff.  On this question, the Court is guided by three Ninth Circuit cases.

In <u>Cooper v. Dupnik</u>, 963 F.2d 1220 (9th Cir. 1992) (en banc), the Ninth Circuit held that police violated a suspect's substantive due process rights when they "ignored [his] repeated requests to speak with an attorney, deliberately infringed on his Constitutional right to remain silent, and relentlessly interrogated him in an attempt to extract a confession."  <u>Id.</u> at 1223.  The court described the officers' techniques as "sophisticated psychological torture" designed to "extract a confession" after "hours of mistreatment," the "twentieth-century inquisitorial version of the Star Chamber."  <u>Id.</u> at 1248.  "The primary aggravating

circumstance" was the officers' "purpose of making it difficult, if not impossible" for the suspect to take the stand in his own defense.  Id. at 1249.

In Stoot, the 14-year-old plaintiff alleged he was subjected to "improper promises and threats" and that because he was a "developmentally delayed young boy, he could not fully and accurately comprehend if [the] promises were reasonable, or make an accurate assessment of the potential outcomes in the same manner as an adult."  582 F.3d at 928-29.  The Ninth Circuit found those allegations to fall "far below what is required to state a claim under the Fourteenth Amendment."  Id. at 929. "Noticeably lacking, for example, [was] any allegation that [the officer] 'intended to injure [the juvenile] in some way unjustifiable by any government interest,' as required by precedent."  Id.

In Crowe, a 14 and 15-year-old were subjected to "hours and hours of interrogation during which they were cajoled, threatened, lied to, and relentlessly pressured by teams of police officers."  608 F.3d at 433.  Noting that the constitutionality of interrogation techniques is judged "by a higher standard when police interrogate a minor," the court found "[t]he interrogations violated [their] Fourteenth Amendment rights to substantive due process." Id.  The court also rejected defendants' claim of qualified immunity because it was well established that interrogations of minors be conducted with "the greatest care."  Id. (citing In re Gault, 387 U.S. 1, 55 (1967)).

Plaintiff's interrogation does not fall clearly within any of these cases.  At thirteen, Plaintiff is the youngest, and experienced some of the interrogation tactics used in Cooper and Crowe.  On the other hand, Plaintiff's interrogation lacked some of the extreme conduct found in those cases.  See, e.g., id. at 431-32 (describing the interrogations as "brutal and inhumane," "psychological torture," and an "extreme form of child abuse");

14

<u>Cooper</u>, 963 F.2d at 1248 (describing Cooper's mistreatment as "sophisticated psychological torture").

The Court therefore declines to find Plaintiff's claim fails as a matter of law.  See <u>T.W. Elec. Serv., Inc.</u>, 809 F.2d at 631 (summary judgment must be denied "if a rational trier of fact might resolve the issue in favor of the nonmoving party"). Summary judgment is denied as to Detectives Pere, Cortina, and Arteaga.  Summary judgment is granted as to Detective Motto because of his limited involvement in Plaintiff's interrogation.

## C. <u>Falsification and Withholding of Evidence (Third Count)</u>

Plaintiff's Third Count alleges Defendants fabricated evidence and deliberately withheld exculpatory evidence.  SAC ¶¶ 179-85.

### 1. **Applicable Law**

"[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc).  A plaintiff can prove deliberate fabrication with either direct evidence of deliberate fabrication or circumstantial evidence related to a defendant's motive.  <u>Id.</u> at 1075-76.  Direct evidence of fabrication includes false statements in police reports and declarations, such as reports that "contain[] evidence or statements" that were "never made."  <u>Costanich v. Dept. of Social and Health Servs.</u>, 627 F.3d 1101, 1112 (9th Cir. 2010).

To prove a fabrication claim using circumstantial evidence, a plaintiff must demonstrate that:  (1) investigators continued their investigation "despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that

15

they knew or should have known those techniques would yield false information." <u>Devereaux</u>, 263 F.3d at 1076. In this regard, evidence of negligent inaccuracy on the part of investigators alone is insufficient to prove a fabrication of evidence claim, <u>see id.</u> at 1077; but investigators "who maliciously or recklessly make[ ] false reports . . . may be . . . liable for damages incurred as a proximate result of those reports," <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 482 (9th Cir. 2007).

<u>Brady v. Maryland</u>, 373 U.S. 83 (1963) requires both prosecutors and police investigators to disclose exculpatory evidence to criminal defendants. <u>See</u> <u>Tennison v. City & Cty. of San Francisco</u>, 570 F.3d 1078, 1087 (9th Cir. 2009) (allowing § 1983 claim against police inspector for <u>Brady</u> violation). To state a claim under <u>Brady</u>, the plaintiff must allege that (1) the withheld evidence was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

## 2. Direct Evidence of Fabrication

Plaintiff relies on direct evidence of fabrication with respect to Officers East, Cooley, and Born, and Detectives Pere and Motto.

While watching the surveillance video, Officer East told Detectives that he had a hard time identifying anyone; he eventually identified Plaintiff and said he was "so much smaller in real life." Yet Officer East's written statement says he was "fairly sure" the suspect was Plaintiff because the individual had a distinct walk and stature similar to Plaintiff, facts not mentioned in his recorded conversation with Detectives. Plaintiff also disputes when Officer East dropped off his and Negroe's

16

statements and whether Officer East's written statement was influenced by his conversations with Detective Cortina. [4]

For Officers Cooley and Born, Plaintiff argues their identifications were "utter nonsense" and "wholly fabricated" because (1) the surveillance video is grainy and low quality, and (2) neither had ever met Plaintiff; Officer Cooley had seen only one picture of Plaintiff the night before, and Officer Born had seen only a "few photos" at some unknown time prior. Plaintiff also notes small inconsistencies between their written statements.

With respect to Detectives Pere and Motto, Plaintiff argues that the witness identifications as reported by the patrol officers who initially responded to the scene described someone older, taller, and heavier than Plaintiff, but the Preliminary Investigation Report (which Detective Pere created and Detective Motto approved) listed the suspect's description as "Med complexion, small build, wearing prescription lenses." Compare Pl. Ex. 47 at LAPD 2169, with id. at LAPD 2170-71.

Plaintiff argues these inconsistencies and omissions were deliberate; Defendants contend otherwise. Is it readily apparent that Plaintiff's version conflicts with Defendants' version of these events. Summary judgment is not appropriate. See Costanich, 627 F.3d at 1113 ("The district court's description of the errors in the investigation as 'recording errors and misstatements' is untenable in light of the principle that, on summary judgment, we

---

[4] Officer East maintains any Section 1983 claims against him fail because his conduct was not the proximate cause of Plaintiff's injury. But this is simply another disputed issue of fact for the jury. See Caldwell v. City and Cty. of San Francisco, 889 F.3d 1105, 1115 (9th Cir. 2018) (citing NINTH CIR. JURY INSTR. COMM., MANUAL OF MODEL CIVIL JURY INSTRUCTIONS, § 9.33 (2017) ("The defendant [*name*] deliberately fabricated evidence that was used to [[criminally charge] [prosecute] [convict]] the plaintiff.")).

must draw all factual inferences in favor of the nonmoving party.").

### 3. Circumstantial Evidence of Fabrication

Plaintiff argues a reasonable juror could find for Plaintiff on both <u>Devereaux</u> prongs because Detectives (1) knew or should have known Plaintiff was innocent and (2) used investigative techniques that were so coercive and abusive that they knew or should have known they would yield false information. Mot. at 45-46.

With respect to the first prong, it is unclear whether "constructive knowledge of innocence is implied merely by the act of fabricating evidence." <u>See</u> <u>Spencer v. Peters</u>, No. C11-5424-BHS, 2014 WL 2208940, at *5 (W.D. Wash. May 28, 2014). In any event, Plaintiff alleges that beyond fabricating evidence, Detectives ignored (or chose not to pursue) evidence of Plaintiff's innocence. For the second prong, the Court has already concluded Plaintiff has presented a triable issue that he experienced a coercive interrogation. Because a dispute of material fact exists, summary judgment as to Plaintiff's <u>Devereaux</u> claims is denied.

### 4. <u>Brady</u> Claim

Plaintiff alleges the "Murder Book" (which LAPD uses to document homicide investigations) produced to Plaintiff's criminal defense attorney omitted more than 300 pages, including the chronology of the investigation, Detective Cortina's notes, and information related to Eric Martinez, who was eventually found in possession of the gun that killed Castaneda. Pl. UF ¶¶ 186-212; <u>Compare</u> Pl. Exs. 62 (Defense Attorney Murder Book), <u>with</u> 64 (LAPD Murder Book); Pl. Ex. 70 (Albin Decl.) ¶¶ 1-6. Detectives contend they turned most everything over to Plaintiff, including files referencing Martinez. Clearly, there is a material dispute as to whether Detectives suppressed exculpatory evidence, the

withholding of which prejudiced Plaintiff.  Summary judgment is not appropriate.

## D. Malicious Prosecution (Fourth Claim)

Plaintiff's Fourth Count alleges Defendants caused him to be subjected to judicial proceedings for which there was no probable cause.  SAC ¶¶ 186-192.

"A criminal defendant may maintain a malicious prosecution claim not only against prosecutors but also against others—including police officers and investigators—who wrongfully caused his prosecution."  Smith v. Almada, 640 F.3d 931, 938 (9th Cir. 2011).  To assert a malicious prosecution claim, a plaintiff must show that "the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her [a] specific constitutional right."  Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995); see also Lassiter v. City of Bremerton, 556 F.3d 1049, 1054-55 (9th Cir.2009) ("[P]robable cause is an absolute defense to malicious prosecution.").

Defendants contend there was probable cause to arrest Plaintiff.  "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."  United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) (citation omitted).  "[M]ere suspicion, common rumor, or even strong reason to suspect are not enough."  Id. (citation omitted).  To defeat summary judgment, then, Plaintiff must identify evidence that would be sufficient to permit a reasonable jury to find that, at the time of his arrest, Defendants lacked "reasonably trustworthy information" supporting a "fair probability" that Plaintiff had committed the murder.  Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004).

Whether Detectives had enough evidence to establish probable cause depends on the aforementioned events. Because the facts are hotly contested, summary judgment is denied.

Detectives rely on Ninth Circuit law holding that "[f]iling of a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." Smiddy v. Varney, 665 F.2d 261, 266 (9th Cir. 1981). To defeat the presumption, a plaintiff must do more than offer his or her own conflicting account of the incident, but must show that the prosecutor was subjected to unreasonable pressure by the investigating officer, that officers knowingly withheld relevant information with the intent to harm the plaintiff, or that officers knowingly supplied false information. See Newman v. Cty. of Orange, 457 F.3d 991, 994-95 (9th Cir. 2006). Because Plaintiff has offered evidence that Defendants knowingly withheld evidence and knowingly fabricated evidence, he has demonstrated a genuine issue of material fact as to whether the prosecutor exercised independent judgment. Summary judgment is denied.

## E. **Failure to Intervene (Fifth Count)**

Plaintiff's Fifth Count alleges Defendants "stood by" without intervening to prevent the violation of Plaintiff's rights. SAC ¶¶ 193-96.

[P]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen." Cunningham, 229 F.3d at 1289. "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." United States v. Koon, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994) rev'd in part on other grounds, 518 U.S. 81 (1996). However, the officer

must have a "realistic opportunity" to intercede. <u>See</u> <u>Cunningham</u>, 229 F.3d at 1289 (finding officers who were at the scene but did not shoot were not liable for Section 1983 violation).

Because Plaintiff's constitutional claims survive, a reasonable juror could conclude that Defendants passively participated in the constitutional deprivations that allegedly led to Plaintiff's conviction. Summary judgment is denied.

## F. <u>Conspiracy (Sixth Count)</u>

Plaintiff's Sixth Count alleges Defendants acted in concert to deprive Plaintiff of his rights. SAC ¶¶ 197-203.

"To establish liability for a conspiracy in a § 1983 case, a plaintiff must 'demonstrate the existence of an agreement or meeting of the minds' to violate constitutional rights." <u>Crowe</u>, 608 F.3d at 440 (quoting <u>Mendocino Envtl. Ctr. v. Mendocino Cty.</u>, 192 F.3d 1283, 1301 (9th Cir. 1999)). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." <u>Id.</u> (citation omitted). To be liable each participant "must at least share the common objective of the conspiracy." <u>Id.</u> (citation omitted).

Plaintiff contends the record is "full of evidence" of an agreement or meeting of the minds among Defendants, starting with Officers Born and Cooley's shaky identifications, Detectives pressuring Officer East to make a false identification, Detectives' coercive interrogation, and several fabricated written reports. Defendants, of course, deny all of this. Given these disputed facts, summary judgment is not appropriate because there is "a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives." <u>Mendocino Envtl. Ctr.</u>, 192 F.3d at 1301-02 (citation omitted).

### G. Municipal Liability (Seventh Count)

Plaintiff's Seventh Count alleges a <u>Monell</u> claim on three theories related to juvenile interrogations:  (1) the City's policies and practices are unconstitutional because detectives need not differentiate between juveniles and adults; (2) the City failed to adopt adequate procedural safeguards to ensure the interrogation of juveniles reflects the "special concern" the Constitution demands; and (3) the City has failed to adequately train its officers in conducting juvenile interrogations.  Mot. at 32-36.

Under <u>Monell v. Dept. of Soc. Serv. of N.Y.</u>, 436 U.S. 658 (1978), a government entity may in certain circumstances be held liable for the unconstitutional conduct of its officers.  "Showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity is one way to establish municipal liability." <u>Ulrich v. City & Cty. of San Francisco</u>, 308 F.3d 968, 984-85 (9th Cir. 2002) (citing <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989)) (internal quotation marks omitted); <u>see also</u> <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996) (the custom must be "so persistent and wide-spread that it constitutes a permanent and well settled city policy."). <u>Monell</u> liability also may attach where a municipality fails to train its officers and it is clear that such failure to train will lead to constitutional violations.  <u>Clement v. Gomez</u>, 298 F.3d 898, 905 (9th Cir. 2002) (citing <u>Cty. of Canton v. Harris</u>, 489 U.S. 378, 389 (1989)).

Plaintiff has provided sufficient evidence to withstand summary judgment on the issue of municipal liability.  Plaintiff notes that although the City has Juvenile-specific manuals, those manuals do not instruct officers that interrogations should be conducted differently than when the suspect is an adult.  Instead, according to Plaintiff, LAPD's policy and practice is to use the same "confrontation techniques" used in adult interrogations, on

juveniles.  Plaintiff also notes that even if the LAPD has adequate policies and procedures concerning <u>Miranda</u>, it lacks rules and guidelines for what happens post-<u>Miranda</u> with respect to juveniles.  Plaintiff also argues Detectives were trained to treat him like an adult, as is evident from his interrogation.  This evidence demonstrates that there is a genuine issue of material fact regarding the City's liability.

## H. **Qualified Immunity**

Defendants argue they are entitled to qualified immunity as a matter of law.  "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time."  <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 589 (2018).

Defendant "bears the burden of proof on the issue of qualified immunity" and so "must produce sufficient evidence to require the plaintiff to go beyond his or her pleadings."  <u>Moreno v. Baca</u>, 431 F.3d 633, 638 (9th Cir. 2005).  On summary judgment, the "defendant's burden is to demonstrate the absence of a genuine issue of material fact."  <u>Id.</u>  Defendants offer insufficient evidence to meet this burden.  As explained, genuine disputes of material fact remain with respect to the constitutional claims against Defendants, and those rights in the context of this case are so well established that law enforcement officers must be deemed to have knowledge of them.  Defendants fail to establish their entitlement to qualified immunity is "beyond controversy."

## V.    CONCLUSION

Officer East's motion for summary judgment is DENIED in its entirety.  Officer Born, Officer Cooley, and the City of Los Angeles's motion for summary judgment is DENIED in its entirety.  Detectives Pere, Cortina, Arteaga, and Motto's motion

for summary judgment is DENIED, except with respect to the interrogation claims against Detective Motto.

IT IS SO ORDERED.

Date: September 17, 2018

Dale S. Fischer
United States District Judge

**NOT FOR PUBLICATION**

FILED

UNITED STATES COURT OF APPEALS

FEB 25 2020

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ART TOBIAS, | No. 18-56245 |
| Plaintiff-Appellee, | D.C. No. |
| v. | 2:17-cv-01076-DSF-AS |
| DANIEL EAST, | |
| Defendant-Appellant, | MEMORANDUM* |
| and | |
| CITY OF LOS ANGELES; et al., | |
| Defendants. | |

| | |
|---|---|
| ART TOBIAS, | No. 18-56360 |
| Plaintiff-Appellee, | D.C. No. |
| v. | 2:17-cv-01076-DSF-AS |
| MICHAEL ARTEAGA; et al., | |
| Defendants-Appellants, | |
| and | |
| CITY OF LOS ANGELES; et al., | |
| Defendants. | |

---

    \*      This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted October 15, 2019
Pasadena, California

Before: WARDLAW and COLLINS, Circuit Judges, and SETTLE,[**] District Judge.

In these consolidated interlocutory appeals,[1] Los Angeles School Police Officer Daniel East and Los Angeles Police Department Detectives Michael Arteaga, Jeff Cortina, John Motto, and Julian Pere challenge the district court's order denying them qualified immunity on Art Tobias's claims under 42 U.S.C. § 1983. We vacate in part, affirm in part, and reverse in part.

1. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal . . . constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). Our jurisdiction over these interlocutory appeals turns on the collateral order doctrine, which permits interlocutory review of whether the district court committed an error of law in denying qualified immunity but not of whether it erred in finding a genuine dispute

---

[**] The Honorable Benjamin H. Settle, United States District Judge for the Western District of Washington, sitting by designation.

[1] We consolidate these appeals for purposes of decision.

2

of material fact. *Mitchell v. Forsyth*, 472 U.S. 511, 527–30 (1985); *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 944–45 (9th Cir. 2017). We cannot adequately assess our jurisdiction without a clear understanding of the district court's basis for denying qualified immunity. *Maropulos v. Cty. of Los Angeles*, 560 F.3d 974, 975 (9th Cir. 2009) (per curiam).

Here, we cannot determine from the district court's order why it denied qualified immunity to Officer East on each of the causes of action asserted against him. The district court did not specifically mention East in its discussion of several of the causes of action or in its brief qualified immunity analysis. In fact, it is not clear whether the district court even analyzed some of the claims asserted against East. For example, the district court granted summary judgment in favor of Detective Motto on the claims arising from the interrogation because of his "limited involvement" in it. But while East was not even present at the interrogation, it appears that the district court's order left the interrogation-related claims against him intact.

We therefore vacate the denial of qualified immunity as to East and remand for the district court to reconsider, on a claim-by-claim basis, whether East is entitled to qualified immunity. We emphasize that the presence of disputed facts does not preclude a finding of qualified immunity. Instead, the district court should determine on remand whether the facts taken in the light most favorable to

3

Tobias show that East violated a clearly established constitutional right. *See Tolan v. Cotton*, 572 U.S. 650, 655–57 (2014) (per curiam).

2.    On the claims against Detectives Arteaga, Cortina, Motto, and Pere (Defendants),[2] we have jurisdiction to determine whether the facts viewed in the light most favorable to Tobias show that Defendants violated Tobias's clearly established constitutional rights. *Pauluk v. Savage*, 836 F.3d 1117, 1121 (9th Cir. 2016).

3.    Defendants appeal the district court's denial of qualified immunity solely with respect to Tobias's claims arising from his interrogation. The relevant causes of action in the operative complaint are (1) a Fifth Amendment claim arising from the use at Tobias's trial of inculpatory statements that allegedly (a) were taken in violation of Tobias's *Miranda* rights, and (b) were involuntary (Count I); (2) a Fourteenth Amendment substantive due process claim alleging that Defendants used interrogation techniques that "shocked the conscience" (Count II); and (3) a Fourteenth Amendment due process claim alleging, in part, that Defendants "fabricated evidence"—including, among other things, "the substance

---

[2] Detective Motto is an appellant only with respect to Tobias's fabrication-of-evidence claim. We use the generic term "Defendants" to refer to the appellants relevant to each claim—all four detectives for the fabrication-of-evidence claim and only Detectives Arteaga, Cortina, and Pere for the other claims.

4

of Plaintiff's oral confession" (Count III).[3]  We conclude that the district court

properly denied qualified immunity on the *Miranda* claim, but that it erred in

denying qualified immunity on all other interrogation-related claims.[4]

     a.     The district court correctly denied qualified immunity on Tobias's

claim that Defendants violated his Fifth Amendment right to counsel by continuing

his custodial interrogation after he requested an attorney and then using the

resulting confession against him in his criminal case.  *See Davis v. United States*,

512 U.S. 452, 458–59 (1994); *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

Tobias's statement—"Could I have an attorney?  Because that's not me"—was an

unequivocal invocation of his right to counsel under clearly established law.  *See*

*Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999) ("Can I get an attorney right

now, man?" was unequivocal); *United States v. De la Jara*, 973 F.2d 746, 750 (9th

Cir. 1992) ("Can I call my attorney?" was unequivocal); *Smith v. Endell*, 860 F.2d

1528, 1529 (9th Cir. 1988) ("Can I talk to a lawyer?" was unequivocal).  The

immaterial fact that Tobias used "could" rather than "can" in requesting an

attorney does not make that request any less unequivocal, and no reasonable officer

---

[3] Count III also alleged a variety of additional misconduct other than the fabricated confession, but Defendants challenge the district court's denial of qualified immunity solely with respect to those issues relating to the interrogation.

[4] Judge Wardlaw dissents, *infra*, from the conclusion that the district court erred in denying qualified immunity on any of the interrogation-related claims.

could conclude otherwise. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam).

b.     The district court erred in denying qualified immunity with respect to Tobias's claims that Defendants obtained and used an involuntary confession in violation of his Fifth Amendment right against self-incrimination and that Defendants violated Tobias's due process rights by using interrogation techniques that shock the conscience.

(i).     "A coercive interrogation exists when the totality of the circumstances shows that the officer's tactics undermined the suspect's ability to exercise his free will," *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003) (citation omitted), and a Fifth Amendment violation occurs when an officer coerces a suspect to provide a confession that is subsequently used in criminal proceedings against that suspect, *Crowe v. County of San Diego*, 608 F.3d 406, 430–31 (9th Cir. 2010).  In determining whether a statement was involuntary, "[c]ourts . . . often consider the following factors: the youth of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).  Even if Tobias's confession were to be deemed involuntary under these standards—a question we

do not reach—qualified immunity would still apply unless the facts available to the Defendants at the time they acted would have made clear to any reasonable police officer that Tobias's statement was involuntary. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) ("qualified immunity analysis thus is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question") (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017)); *see also City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that *any reasonable official in the defendant's shoes would have understood that he was violating it*.") (emphasis added) (citations and internal quotation marks omitted); *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir. 2009) (although Fifth Amendment claim requires subsequent use of statement in criminal proceedings, focus of § 1983 suit against officer is on the circumstances of the interrogation that preceded "turn[ing] over the allegedly coerced statements to prosecutors").

Tobias failed to meet this demanding standard. *See Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct."). Although the interrogating officers committed a clear-cut *Miranda*/*Edwards* violation, that fact alone is not sufficient to establish that the

7

resulting confession was involuntary. *Bradford v. Davis*, 923 F.3d 599, 616 (9th Cir. 2019) ("statements taken in violation of *Edwards* … are not presumed to be involuntary by virtue of the *Edwards* violation alone"). Considered against the controlling precedent that has found coercion in custodial interrogation, the objective circumstances of Tobias's interrogation, viewed in the light most favorable to him, were not such that any reasonable police officer would have realized that the Fifth Amendment right against compelled self-incrimination was being violated.

Although Tobias was only 13 years old and his unequivocal request for counsel was improperly brushed aside, his early-evening interrogation lasted only 90 minutes, involved no physical threats or abuse, and otherwise relied on interrogation techniques that cannot be said, either singly or in the combination presented here, to have violated clearly established law (*e.g.*, bluffing about the strength of the evidence the officers had, arguing that the courts would go easier on the suspect if he confessed to what he had done, and shaming the suspect for the effect a prosecution would have on his family). Although the question is a close one in light of the patent violation of Tobias's right to counsel, in our view Tobias has failed to show that the officers' conduct in the interrogation constituted impermissible coercion under clearly established law.

Like the Fourth Amendment prohibition of excessive force, the Fifth

Amendment protection against the use of involuntary statements at a criminal trial is one that involves "an area of the law 'in which the result depends very much on the facts of each case.'" *Kisela*, 138 S. Ct. at 1153 (citation omitted); *see Haswood*, 350 F.3d at 1027 (courts employ "no 'talismanic definition' of voluntariness," but instead consider the "totality of the circumstances" of the interrogation); *see also supra* at 6 (listing factors considered). Consequently, just as in excessive force cases, "[s]pecificity" is important here, because "'it is sometimes difficult for an officer to determine how the relevant legal doctrine'"— here, the law against coerced confession—"'will apply to the factual situation the officer confronts.'" *Kisela*, 138 S. Ct. at 1152 (citation omitted). As a result, a plaintiff seeking to defeat qualified immunity must establish that "*any* reasonable official in the defendant[s'] shoes would have understood" that the *particular* circumstances of the specific interrogation were impermissibly coercive under the then-existing case law. *Id*. at 1153 (citation and internal quotation marks omitted) (emphasis added); *see also Hunter v. Bryant*, 502 U.S. 224, 229 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") (citation and internal quotation marks omitted).

Here, the particular circumstances of the interrogation do not present the same sort of confluence of features that we have previously held to be coercive.

*Cf., e.g., Taylor v. Maddox*, 366 F.3d 992, 1015–16 (9th Cir. 2004) (confession was clearly involuntary where 16-year-old suspect was arrested late at night, questioned until 3:00 AM, threatened with a jab to the face, and had his repeated requests for counsel denied), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014); *Gladden v. Holland*, 366 F.2d 580, 582 (9th Cir. 1966) (finding coercion where officers ignored a request for counsel but also conducted the interrogation "throughout the night" and called in alleged rape victims to view the suspect). On the contrary, they appear to be *less* coercive than other cases in which we have found that coercion had *not* been established. *See, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (noting that coercion is not established where police merely indicate that a cooperative attitude would benefit a minor suspect); *Cunningham*, 345 F.3d at 810 (finding no coercion where interrogation went for eight hours without a break, officers continued to question the suspect after claims of innocence, and officers played on the suspect's fear of prison). Because it would not have been apparent to any reasonable officer that the circumstances of this specific interrogation were unconstitutional, the officers were entitled to qualified immunity on Tobias's claim that the officers violated his Fifth Amendment right against compelled self-incrimination.[5]

---

[5] Whether Tobias's remaining Fifth Amendment interrogation claim—that his statement was taken in violation of *Edwards* and used at a criminal trial—is

(ii).    The district court also erred in denying qualified immunity to the detectives on the claim that the interrogation violated Tobias's Fourteenth Amendment right to substantive due process.  *See Stoot*, 582 F.3d at 928.  Although this claim (unlike the Fifth Amendment claim) does not require a showing that the confession was used against Tobias, "[t]he standard . . . is quite demanding," requiring something akin to "police torture or other abuse" or comparable conduct that "shocks the conscience."  *Id.* (citations and internal quotation marks omitted).  For reasons similar to those discussed above with respect to Tobias's coerced confession claim, we conclude that, even construing the facts in the light most favorable to Tobias, he failed to show that any reasonable officer would have understood that the objective circumstances of the interrogation here met the demanding "shocks the conscience" standard.

The facts of this case are materially different from previous cases in which we have found a substantive due process violation for police conduct during an interrogation.  *See, e.g.*, *Cooper v. Dupnik*, 963 F.2d 1220, 1248–50 (9th Cir. 1992) (en banc) (finding a substantive due process violation when officers subjected a suspect to "hours of mistreatment and what can fairly be described as sophisticated psychological torture" and intentionally ignored the suspect's repeated invocations

---

cognizable under § 1983 is not at issue in this interlocutory appeal, and we express no view on it.

11

of his right to counsel and right to silence and for the express "purpose of making it difficult, if not impossible, for [the defendant] to take the stand in his own defense"), *overruled on other grounds*, *Chavez v. Martinez*, 538 U.S. 760, 773 (2003). Tobias's reliance on *Crowe*, 608 F.3d 406, is misplaced. *Crowe* is distinguishable because there, one of the boys interviewed was "in shock over his sister's brutal murder," and the boys were subjected to "hours and hours of interrogation" featuring "the most psychologically brutal interrogation and tortured confession" that one expert witness had ever observed. *Id*. at 431–32. Because controlling precedent does not establish "beyond debate" that the officers' conduct here shocks the conscience, the officers are entitled to qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

4. Defendants also challenge the district court's denial of qualified immunity as to Tobias's fabrication-of-evidence claim (asserted under *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc)), but only to the extent that the claim is based on the contention that Tobias's confession is the asserted fabricated evidence. Defendants are entitled to qualified immunity on this issue because we have held that coerced confession claims are not cognizable under a *Devereaux* fabrication-of-evidence theory. *See Hall v. City of Los Angeles*, 697 F.3d 1059, 1069–70 (9th Cir. 2012).

Each party shall bear its own costs.

**VACATED IN PART, AFFIRMED IN PART, REVERSED IN PART.**

*Tobias v. East*, Nos. 18-56245+

WARDLAW, Circuit Judge, dissenting in part:

I respectfully dissent from the majority's conclusion that the interrogation tactics used by Detectives Michael Arteaga, Jeff Cortina, and Julian Pere did not violate clearly established Fifth and Fourteenth Amendment law.[1] The detectives in this case cursed at Art Tobias (then 13 years old), ignored his request for counsel, repeatedly told him that he looked like a "cold-blooded killer," falsely said that somebody had "given him up," shamed him for "dragging [his] family into this," promised him likely leniency if he confessed, and threatened him with a harsh sentence if he stayed silent. After more than an hour of this treatment, Tobias broke down and confessed to a murder he did not commit.

"It has . . . long been established that the constitutionality of interrogation techniques is judged by a higher standard when police interrogate a minor." *Crowe v. Cty. of San Diego*, 608 F.3d 406, 431 (9th Cir. 2010). In *Crowe*, we held that officers committed a Fourteenth Amendment substantive due process violation when they "cajoled, threatened, lied to, and relentlessly pressured" two young teenagers into falsely confessing. *Id.* at 432. That is precisely what Detectives Arteaga, Cortina, and Pere did here.

---

[1] I concur in Sections 1, 2, 3(a), and 4 of the memorandum disposition.

A.38

*Crowe* clearly established that the detectives' conduct violated the Fourteenth Amendment.  And in light of *Crowe*, every reasonable officer would also have understood that the interrogation tactics here were unconstitutionally coercive, in violation of the Fifth Amendment.  For these reasons, I would affirm the district court's conclusion that Detectives Arteaga, Cortina, and Pere are not entitled to qualified immunity on the coercive interrogation and substantive due process claims.