# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ART TOBIAS,

*Plaintiff-Appellee,*

v.

MICHAEL ARTEAGA, Detective No. 32722; et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Central District of California, No. 2:17-cv-001076-DSF-AS
District Judge Dale S. Fischer

## BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF PETITION FOR REHEARING EN BANC

Clark M. Neily III
Jay R. Schweikert
   *Counsel of Record*
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 216-1461
jschweikert@cato.org

*Counsel for the Cato Institute*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus*'s participation.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ...................................... ii

INTEREST OF *AMICUS CURIAE* ........................................................... 1

SUMMARY OF THE ARGUMENT ...................................................... 2

ARGUMENT ......................................................................................... 3

I.   THE DOCTRINE OF QUALIFIED IMMUNITY IS UNTETHERED FROM ANY STATUTORY OR HISTORICAL JUSTIFICATION. .......................... 3

   A. The text of 42 U.S.C. § 1983 does not provide for any kind of immunity. ................................................................................. 3

   B. From the founding through the passage of Section 1983, good faith was not a defense to constitutional torts. ............................................ 4

   C. The common law of 1871 provided limited defenses to certain torts, not general immunity for all public officials. .................................... 7

II.  THE COURT SHOULD GRANT THE PETITION AND ADDRESS THE SHORTCOMINGS OF QUALIFIED IMMUNITY GENERALLY. ............. 10

CONCLUSION ..................................................................................... 14

CERTIFICATE OF COMPLIANCE ..................................................... 15

CERTIFICATE OF SERVICE ............................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Myers*, 182 F. 223 (C.C.D. Md. 1910)...............................................7, 9

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ............................................................4

*Cherrington v. Skeeter*, 344 F.3d 631 (6th Cir. 2003).............................................12

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010) ................................10

*Estate of Smart v. City of Wichita*, No. 14-2111-JPO, 2018 U.S. Dist. LEXIS 132455 (D. Kan. Aug. 7, 2018)........................................................................................13

*Filarsky v. Delia*, 566 U.S. 377 (2012)......................................................................7

*Forrester v. White*, 484 U.S. 219 (1988) ....................................................................4

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................................................ 9, 11

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018)............................................................ 2, 12

*Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804) ....................................................5, 6

*Malley v. Briggs*, 475 U.S. 335 (1986) ............................................................... 4, 10

*Manzanares v. Roosevelt Cty. Adult Det. Ctr.*, No. CIV 16-0765, 2018 U.S. Dist. LEXIS 147840 (D. N.M. Aug. 30, 2018) .............................................................13

*Myers v. Anderson*, 238 U.S. 368 (1915)...................................................................6

*Pearson v. Callahan*, 555 U.S. 223 (2009)................................................... 3, 11, 12

*Pierson v. Ray*, 386 U.S. 547 (1967) ............................................................. 4, 7, 8

*Purtell v. Mason*, 527 F.3d 615 (7th Cir. 2008).......................................................12

*Ross v. Blake*, 136 S. Ct. 1850 (2016) .......................................................................3

*Saucier v. Katz*, 533 U.S. 194 (2001) ......................................................................11

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ...................................................................9

*Thompson v. Clark*, No. 14-CV-7349, 2018 U.S. Dist. LEXIS 105225 (E.D.N.Y. June 11, 2018) ...................................................................................................13

*Wheatt v. City of E. Cleveland*, No. 1:17-CV-377, 2017 U.S. Dist. LEXIS 200758 (N.D. Ohio Dec. 6, 2017)...................................................................................13

*Zadeh v. Robinson*, 902 F.3d 483 (5th Cir. 2018) ............................................. 2, 13

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)......................................................... 2, 12

**Statutes**

42 U.S.C. § 1983 ..................................................................................2, 4

**Other Authorities**

Ann Woolhandler, *Patterns of Official Immunity and Accountability*, 37 CASE W. RES. L. REV. 396 (1986) ..................................................................5

David E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. COLO. L. REV. 1 (1972) ...................................... 5, 6, 9

JAMES E. PFANDER, CONSTITUTIONAL TORTS AND THE WAR ON TERROR (2017) ......5

Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018) ..................................................................................2

Jon O. Newman, Opinion, *Here's a Better Way to Punish the Police: Sue Them for Money*, WASH. POST (June 23, 2016) ...................................................13

Lynn Adelman, *The Supreme Court's Quiet Assault on Civil Rights*, DISSENT (Fall 2017) ..............................................................................................13

*Protection of Officers Who Act Under Unconstitutional Statutes*, 11 MINN. L. REV. 585 (1927) ....................................................................................9

RESTATEMENT (SECOND) OF TORTS § 121 (AM. LAW. INST. 1965) ..........................8

Stephen Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity*, 113 MICH. L. REV. 1219 (2015) .......................................14

William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45 (2018) .................................................................................................... passim

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Project on Criminal Justice was founded in 1999, and focuses on the scope of substantive criminal liability, the proper and effective role of police in their communities, the protection of constitutional safeguards for criminal suspects and defendants, citizen participation in the criminal justice system, and accountability for law enforcement.

Cato's interest in this case arises from the lack of legal justification for qualified immunity, the deleterious effect it has on the ability of citizens to vindicate their constitutional rights, and the subsequent erosion of accountability among public officials that the doctrine encourages.

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in whole or in part. No one other than *amicus* and its members made monetary contributions to its preparation or submission. Pursuant to 9th Cir. R. 29-2(a), counsel for both parties have consented to the filing of this brief.

# SUMMARY OF THE ARGUMENT

Over the last half-century, the doctrine of qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based. The text of 42 U.S.C. § 1983 ("Section 1983") makes no mention of immunity, and the common law of 1871 did not include an across-the-board defense for all public officials. With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly concluded that qualified immunity is unmoored from any lawful justification—and in serious need of correction.[2]

Of course, this Court must apply binding Supreme Court precedent, and as explained in Plaintiffs-Appellees' petition, faithful application of that precedent warrants rehearing. But in reversing the panel's error, the Court should also acknowledge and address the maturing contention that qualified immunity itself is

---

[2] *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (qualified immunity has become "an absolute shield for law enforcement officers" that has "gutt[ed] the deterrent effect of the Fourth Amendment"); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence."); *Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring) (noting "disquiet over the kudzu-like creep of the modern [qualified] immunity regime"); William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018).

unjustified. The Supreme Court has already indicated unusual readiness to reconsider aspects of its qualified immunity jurisprudence, especially in light of express criticism by appellate courts. *See Pearson v. Callahan*, 555 U.S. 223, 235 (2009) (citing cases). It would thus be both appropriate and prudent to recognize and register faults with the doctrine generally. The Court should also grant rehearing to avoid internal Circuit conflicts and to prevent an unwarranted expansion of the "clearly established law" standard beyond what the Supreme Court itself has instructed.

## ARGUMENT

## I. THE DOCTRINE OF QUALIFIED IMMUNITY IS UNTETHERED FROM ANY STATUTORY OR HISTORICAL JUSTIFICATION.

### A. The text of 42 U.S.C. § 1983 does not provide for any kind of immunity.

"Statutory interpretation . . . begins with the text." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Yet few judicial doctrines have deviated so sharply from this axiomatic proposition as qualified immunity. As currently codified, Section 1983 provides, in relevant part:

> ***Every person who***, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, ***subjects***, or causes to be subjected, ***any citizen*** of the United States or other person within the jurisdiction thereof ***to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured*** in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphases added). Notably, "the statute on its face does not provide for *any* immunities." *Malley v. Briggs*, 475 U.S. 335, 342 (1986).

Of course, no law exists in a vacuum, and a statute will not be interpreted to extinguish by implication longstanding legal defenses available at common law. *See Forrester v. White*, 484 U.S. 219, 225-26 (1988). In the context of qualified immunity, the Supreme Court has appropriately framed the issue as whether "[c]ertain immunities were so well established in 1871, when § 1983 was enacted, that 'we presume that Congress would have specifically so provided had it wished to abolish' them." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (quoting *Pierson v. Ray*, 386 U.S. 547, 554-55 (1967)). But the historical record shows that the common law did not, in fact, provide for any such immunities.

### B. From the founding through the passage of Section 1983, good faith was not a defense to constitutional torts.

The doctrine of qualified immunity is a kind of generalized good-faith defense for all public officials, as it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341. But the relevant legal history does not justify importing any such freestanding good-faith defense into the operation of Section 1983; on the contrary, the sole historical defense against constitutional violations was *legality*.[3] More specifically, in the founding era,

---

[3] *See* Baude, *supra*, at 55-58.

government agents could not generally raise a good-faith defense to what we would now call "constitutional torts" (i.e., a common-law tort brought against a federal official, where the defense was federal authorization, and the plaintiff argued unconstitutionality of the defendant's conduct to defeat the defense).[4]

The clearest example of this principle is Chief Justice Marshall's opinion in *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804), which involved a claim against an American naval captain who captured a Danish ship off the coast of France. Federal law authorized seizure only if a ship was going *to* a French port (which this ship was not), but President Adams had issued broader instructions to also seize ships coming *from* French ports. *Id.* at 178. The question was whether Captain Little's reliance on these instructions was a defense against liability for the unlawful seizure.

The *Little* decision makes clear that the Court seriously considered but ultimately rejected the very rationales that would later come to support the doctrine of qualified immunity. Chief Justice Marshall explained that "the first bias of my mind was very strong in favour of the opinion that though the instructions of the executive could not give a right, they might yet excuse from damages." *Id.* at 179.

---

[4] *See* JAMES E. PFANDER, CONSTITUTIONAL TORTS AND THE WAR ON TERROR 3-14, 16-17 (2017); David E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. COLO. L. REV. 1, 14-21 (1972); Ann Woolhandler, *Patterns of Official Immunity and Accountability*, 37 CASE W. RES. L. REV. 396, 414-22 (1986).

He noted that the captain had acted in good-faith reliance on the President's order, and that the ship had been "seized with pure intention." *Id.* Nevertheless, the Court held that "the instructions cannot change the nature of the transaction, or legalize an act which without those instructions would have been a plain trespass." *Id.* In other words, the officer's only defense was legality, not good faith.

This strict rule of personal official liability persisted through the nineteenth century,[5] and courts continued to hold public officials liable for unconstitutional conduct without regard to a good-faith defense.[6] Most importantly, the Supreme Court originally rejected the application of a good-faith defense to Section 1983 itself. In *Myers v. Anderson*, 238 U.S. 368 (1915), the Court held that a state statute violated the Fifteenth Amendment's ban on racial discrimination in voting. *Id.* at 380. The defendants argued they could not be liable for money damages under Section 1983, because they acted on a good-faith belief that the statute was constitutional. The Court noted that "[t]he non-liability . . . of the election officers for their official conduct is seriously pressed in argument," but ultimately rejected any such defense. *Id.* at 378.

*Myers* did not elaborate much on this point, but the lower court decision it affirmed was more explicit:

---

[5] Engdahl, *supra*, at 19.

[6] Baude, *supra*, at 57.

> [A]ny state law commanding such deprivation or abridgment is nugatory and not to be obeyed by any one; and any one who does enforce it does so at his known peril and is made liable to an action for damages by the simple act of enforcing a void law to the injury of the plaintiff in the suit, and no allegation of malice need be alleged or proved.

*Anderson v. Myers*, 182 F. 223, 230 (C.C.D. Md. 1910). This forceful rejection of any good-faith defense "is exactly the logic of the founding-era cases, alive and well in the federal courts after Section 1983's enactment."[7]

### C. The common law of 1871 provided limited defenses to certain torts, not general immunity for all public officials.

The Supreme Court's primary rationale for qualified immunity has been the purported existence of similar immunities that were part of the common law of 1871. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). But to the extent contemporary common law included any such protections, they were simply incorporated into the elements of particular torts.[8] In other words, a good-faith belief might be relevant to the *merits*, but there was nothing like the freestanding immunity for all public officials that characterizes the doctrine today.

For example, as the Supreme Court explained in *Pierson v. Ray*, 386 U.S. 547 (1967), "[p]art of the background of tort liability, in the case of police officers making an arrest, is the defense of good faith and probable cause." *Id.* at 556-57. But

---

[7] Baude, *supra*, at 58 (citation omitted).

[8] *See generally* Baude, *supra*, at 58-60.

this defense was not historically a protection from liability for unlawful conduct. Rather, at common law, an officer who acted with good faith and probable cause simply did not commit the tort of false arrest in the first place.[9]

Relying on this background principle of tort liability, the *Pierson* Court "pioneered the key intellectual move" that became the genesis of modern qualified immunity.[10] *Pierson* involved a Section 1983 suit against police officers who arrested several people under an anti-loitering statute that the Court subsequently found unconstitutional. Based on the common-law elements of false arrest, the Court held that "the defense of good faith and probable cause . . . is also available to [police] in the action under [Section] 1983." *Id.* Critically, the Court extended this defense to include not just a good-faith belief in probable cause for the *arrest*, but a good-faith belief in the legality of the *statute* under which the arrest was made. *Id.* at 555.

Even this first extension of the good-faith aegis was questionable as a matter of constitutional and common-law history. Conceptually, there is an important difference between good faith as a factor that determines whether conduct was unlawful in the first place (as with false arrest), and good faith as a defense to liability for admittedly unlawful conduct (as with enforcing an unconstitutional statute). As

---

[9] *See* RESTATEMENT (SECOND) OF TORTS § 121 (AM. LAW. INST. 1965).

[10] Baude, *supra*, at 52.

discussed above, the baseline historical rule at the founding and in 1871 was strict liability for constitutional violations. *See Anderson*, 182 F. at 230.[11]

Nevertheless, the *Pierson* Court at least grounded its decision on the premise that the analogous tort at issue—false arrest—admitted a good-faith defense at common law. But the Court's qualified immunity cases soon discarded even this loose tether to history. By 1974, the Supreme Court had abandoned the analogy to those common-law torts that permitted a good-faith defense. *See Scheuer v. Rhodes*, 416 U.S. 232, 247 (1974). And by 1982, the Court disclaimed reliance on the subjective good faith of the defendant, instead basing qualified immunity on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The Supreme Court's qualified immunity jurisprudence has therefore diverged sharply from any plausible legal or historical basis. Section 1983 provides no textual support for the doctrine, and the relevant history establishes a baseline of strict liability for constitutional violations—at most providing a good-faith defense

---

[11] *See also* Engdahl, *supra*, at 18 (a public official "was required to judge at his peril whether his contemplated act was actually authorized . . . [and] judge at his peril whether . . . the state's authorization-in-fact . . . was constitutional"); Max P. Rapacz, *Protection of Officers Who Act Under Unconstitutional Statutes*, 11 MINN. L. REV. 585, 585 (1927) ("Prior to 1880 there seems to have been absolute uniformity in holding officers liable for injuries resulting from the enforcement of unconstitutional acts.").

against claims analogous to some common-law torts. Yet qualified immunity functions today as an across-the-board defense, based on a "clearly established law" standard that was unheard of before the late twentieth century. In short, the doctrine has become exactly what the Court assiduously sought to avoid—a "freewheeling policy choice," at odds with Congress's judgment in enacting Section 1983. *Malley*, 475 U.S. at 342.

## II. THE COURT SHOULD GRANT THE PETITION AND ADDRESS THE SHORTCOMINGS OF QUALIFIED IMMUNITY GENERALLY.

*Amicus* obviously recognizes that this Court is obliged to follow Supreme Court precedent with direct application. And for all the reasons given in the petition, the panel failed to comply with that precedent. In *Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010), this Court made clear that when a juvenile suspect is "cajoled, threatened, lied to, and relentlessly pressured by teams of police officers" into confessing, that misconduct is not only unlawful, but a violation of clearly established law. *Id.* at 432. As explained in both the petition and Judge Wardlaw's dissent below, the facts of this case are incredibly similar to the facts of *Crowe*, and this Court has already decided that qualified immunity is unavailable in such a circumstnace. For better or worse, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341—yet the defendants' actions in this case meet both of these conditions.

But in addition to correcting the panel's serious errors, the Court should grant the petition to address the infirmities with qualified immunity more generally. It is both appropriate and useful for judges to candidly acknowledge the shortcomings of present case law, even as they adhere to it for purposes of deciding cases. This criticism-and-commentary function is especially important in the realm of qualified immunity, as the Supreme Court has already demonstrated its willingness to "openly tinker[] with [qualified immunity] to an unusual degree."[12]

In *Pierson*, for example, the Court created a good-faith defense to suits under Section 1983, after having rejected the existence of any such defense half a century earlier, in *Myers*. Then in *Harlow*, the Court replaced subjective good-faith assessment with the "clearly established law" standard. 457 U.S. at 818-19. And the Court created a mandatory sequencing standard in *Saucier v. Katz*, 533 U.S. 194 (2001)—requiring courts to first consider the merits and then consider qualified immunity—but then retreated from the *Saucier* standard in *Pearson v. Callahan*, 555 U.S. 223 (2009), which made that sequencing optional.

*Pearson* is especially instructive, because the Supreme Court justified reversal of its precedent in large part due to the input of lower courts. *See* 555 U.S. at 234 ("Lower court judges, who have had the task of applying the *Saucier* rule on a

---

[12] Baude, *supra*, at 81.

regular basis for the past eight years, have not been reticent in their criticism of *Saucier*'s 'rigid order of battle.'" (quoting *Purtell v. Mason*, 527 F.3d 615, 622 (7th Cir. 2008))); *id.* at 234-35 ("[A]pplication of the [*Saucier*] rule has not always been enthusiastic." (citing *Cherrington v. Skeeter*, 344 F.3d 631, 640 (6th Cir. 2003))).

Ultimately, *Pearson* considered and rejected the argument that *stare decisis* should prevent the Supreme Court from reconsidering its qualified immunity jurisprudence. The Court noted in particular that the *Saucier* standard was a "judge-made rule" that "implicates an important matter involving internal Judicial Branch operations," and that "experience has pointed up the precedent's shortcomings." *Id.* at 233-34. As this brief has endeavored to show, the same charges can be laid against qualified immunity more generally. It would be a strange principle of stare decisis that permitted modifications only as a one-way ratchet in favor of greater immunity (and against the grain of text and history to boot).

Input from the lower courts on this issue is especially relevant now, as several members of the Supreme Court have recently expressed an interest in reconsidering qualified immunity. *See Kisela*, 138 S. Ct. at 1162 (Sotomayor, J., dissenting, joined by Ginsburg, J.) (describing how qualified immunity has become "an absolute shield for law enforcement officers" that has "gutt[ed] the deterrent effect of the Fourth Amendment"); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J.,

concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence.").

It is thus unsurprising that an increasingly large number of lower-court judges have also begun to express concerns with the doctrine. *See, e.g.*, *Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring) ("I write separately to register my disquiet over the kudzu-like creep of the modern immunity regime. Doctrinal reform is arduous, often-Sisyphean work. . . . But immunity ought not be immune from thoughtful reappraisal."); *Estate of Smart v. City of Wichita*, No. 14-2111-JPO, 2018 U.S. Dist. LEXIS 132455, *46 n.174 (D. Kan. Aug. 7, 2018) ("[T]he court is troubled by the continued march toward fully insulating police officers from trial—and thereby denying any relief to victims of excessive force—in contradiction to the plain language of the Fourth Amendment.").[13] *Amicus*

---

[13] *See also Manzanares v. Roosevelt Cty. Adult Det. Ctr.*, No. CIV 16-0765, 2018 U.S. Dist. LEXIS 147840, *57 n.10 (D. N.M. Aug. 30, 2018) ("The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy."); *Thompson v. Clark*, No. 14-CV-7349, 2018 U.S. Dist. LEXIS 105225, *26 (E.D.N.Y. June 11, 2018) ("The legal precedent for qualified immunity, or its lack, is the subject of intense scrutiny."); *Wheatt v. City of E. Cleveland*, No. 1:17-CV-377, 2017 U.S. Dist. LEXIS 200758, *8-9 (N.D. Ohio Dec. 6, 2017) (criticizing the Supreme Court's decision to permit interlocutory appeals for denials of qualified immunity); Lynn Adelman, *The Supreme Court's Quiet Assault on Civil Rights*, DISSENT (Fall 2017) (essay by judge on the U.S. District Court for the Eastern District of Wisconsin); Jon O. Newman, Opinion, *Here's a Better Way to Punish the Police: Sue Them for Money*, WASH. POST (June 23, 2016) (article by senior judge on the Second Circuit); Stephen Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified*

respectfully requests that this Court—in addition to granting the petition—add its voice to the larger dialogue on this crucial and timely issue.

## CONCLUSION

For the foregoing reasons, as well as those presented by Plaintiffs-Appellees, the Court should grant the petition.

Respectfully submitted,

DATED: May 11, 2020.

*/s/ Jay R. Schweikert*

Clark M. Neily III
Jay R. Schweikert
    *Counsel of Record*
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 216-1461
jschweikert@cato.org

---

*Immunity*, 113 MICH. L. REV. 1219 (2015) (article by former judge of the Ninth Circuit).

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of 9th Cir. R. 29-2(c)(2) because it contains 3,270 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Times New Roman, 14-point font.


/s/ *Jay R. Schweikert*
May 11, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court, who will enter it into the CM/ECF system, which will send a notification of such filing to the appropriate counsel.

/s/ *Jay R. Schweikert*
May 11, 2020